Tony and Juanita ROSS, Respondents,

v.

**FORD MOTOR CREDIT COMPANY, et al., Appellants.**

**Tony and Juanita ROSS, Appellants,**

v.

**FORD MOTOR CREDIT COMPANY, et al., Respondents.**

Nos. WD 46531, WD 46567.

Missouri Court of Appeals, Western District.

Oct. 12, 1993.

As Modified Nov. 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Nov. 30, 1993.

Application to Transfer Denied Jan. 25, 1994.

Jeffrey A. Befort, James W. Humphrey, Jr., Kansas City, for Ford Motor Credit Co.

John Joseph McFadden, Jr., Kansas City, James S. Formby, Grain Valley, for Tony and Juanita Ross.

Before KENNEDY, P.J., and FENNER and SPINDEN, JJ.

KENNEDY, Presiding Judge.

Plaintiffs, Tony and Juanita Ross, had verdicts and judgments against Ford Motor Credit Company (Ford Motor Credit) for actual and punitive damages on several counts growing out of Ford Motor Credit's repossession in a replevin action of a 1979 Mercury automobile in the possession of the Rosses. Ford Motor Credit has appealed.

The Rosses have cross-appealed from the judgments in their libel and conversion claims against Ford Motor Credit, with the

complaint that the trial court erred by reducing the amounts of their actual damages awarded by the jury verdicts, and from the judgment for Ford Motor Credit on their abuse of process claim. They have appealed also from the trial court's denial of their request for attorney's fees in their section 1983 claims against Ford Motor Credit.

The facts are as follows:

The Rosses had in their possession a 1979 Mercury Grand Marquis automobile which they had gotten from North Hills Lincoln Mercury. The Rosses claimed they were test driving the car with a view to purchasing it. North Hills, on the other hand, claimed the Rosses had purchased the car in November, 1979. North Hills claimed that on November 6 and 7, 1979, the Rosses traded in a 1976 Buick Electra automobile, assigned the title thereto, and signed a retail buyer's order, a credit application, and a note for $8,939.04, secured by a security interest in the 1979 Mercury. The note represented the $5,600 balance of the Mercury's purchase price (after a $5,100 allowance for the 1976 Buick), plus finance charges, payable in 48 monthly payments of $186.23 each. The Rosses maintained their signatures had been forged on the documents, and that they had only left the 1976 Buick with North Hills while they were test-driving the 1979 Mercury.

On November 16, 1979, North Hills assigned the Rosses' note and its security interest in the 1979 Mercury to Ford Motor Credit, receiving therefor the amount of $7,078 from Ford Motor Credit. Ford Motor Credit sent the Rosses a loan payment book, which was received by the Rosses on December 19 or 20, 1979.

The Rosses never made any payments to Ford Motor Credit. On January 29, 1980, Richard Van Leeuwen, Ford Motor Credit's assistant branch manager, contacted Mr. Ross. Mr. Ross denied to him that he had purchased the 1979 Mercury. At that time Mr. Ross also told Mr. Van Leeuwen that the

North Hills dealer had forged the contract of purchase. Mr. Ross stated he wanted his 1976 Buick back, and wanted to return the 1979 Mercury to North Hills. He would not surrender the 1979 Mercury to Ford Motor Credit, though, because he wanted to use it for leverage to get back his 1976 Buick.

Ford Motor Credit initiated a replevin suit against the Rosses in the Circuit Court of Jackson County. The suit was filed March 4, 1980. The petition, with supporting affidavit, sought immediate possession of the 1979 Mercury, which was stated to have a value of $7,000. Ford Motor Credit posted a forthcoming bond in the amount of $14,000. Circuit Judge Gant signed an ex parte "order of delivery" on March 5, 1980. Alfred Ferguson, a deputy process server of the Jackson County Circuit Court on March 10 repaired to the Ross home at 5406 Byrams Ford Road, Kansas City, Missouri, accompanied by a locksmith provided by Ford Motor Credit. No one was home. The process server allowed the opening of the locked garage door by the locksmith. The car was delivered to Ford Motor Credit, which removed the car. At 11:30 that night, Mrs. Ross received a telephone call about the replevin from the Sheriff's office. On March 12, the process server delivered to Mr. Ross the order of delivery and the notice of his right to post a redelivery bond, and his right to a hearing under Rule 99.

Other facts will appear later in this opinion. These are enough for present purposes.

Out of this factual matrix sprang a 15-count lawsuit by the Rosses against North Hills, Ford Motor Credit, and others. The Rosses, as noted above, had verdicts against North Hills and against Ford Motor Credit for actual and punitive damages on various counts. The claims against other defendants were disposed of by settlement and dismissal.[1] North Hills has not appealed. The parties to this appeal are only Ford Motor Credit and the Rosses.

---

1. One count of the Rosses' 15-count petition was against F.J. Foster, the notary public, and Zurich–American Insurance Companies for false jurat. This count was settled before trial for $7,500. Another count was against the First

National Bank of Independence, which had a lien on the 1976 Buick, for breach of trust in releasing the title to North Hills without the Rosses' authority. This count was settled before trial for $3,500.

### COUNTS III AND IV: SECTION 1983 CLAIMS

The Rosses' petition charged Ford Motor Credit in two counts with the deprivation of the Rosses' constitutional rights. The Rosses' theory is that Ford Motor Credit, in seizing the Mercury in the manner described above, deprived the Rosses of their constitutional right to due process of law (14th Amendment), and that its seizing the car from their garage constituted an unreasonable search and seizure (4th Amendment). They base their claim upon 42 U.S.C. § 1983. That brief statute reads as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State
>
> ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress.

At the conclusion of the evidence, the trial court directed verdicts in favor of plaintiffs on the liability issue on Count III (deprivation of due process) and Count IV (unreasonable search and seizure). The court submitted the two claims on the issues of actual and punitive damages only. On Count III, the jury returned a verdict in plaintiffs' favor for $600 actual damages and $10,000 punitive damages. On Count IV, the verdict was for $150 actual damages and $2.5 million punitive damages.

Ford Motor Credit claims the court erred in directing a verdict for plaintiffs on the issue of liability on the two counts, and claiming the court erred in denying its own motions for judgment n.o.v.

We hold that plaintiffs did not make a submissible section 1983 case under either count.[2]

In order to prevail in a section 1983 action for damages against Ford Motor Credit, the Rosses must show three things: They must show, first, that Ford Motor Credit deprived them of their constitutional rights in the pre-hearing seizure of the 1979 Mercury automobile; second, they must show that, in doing so, Ford Motor Credit was acting in accordance with a state law, or in accordance with a custom or usage of the state; and, third, that the state law, or the state custom or usage, was the cause of, or was the "moving force" behind, the deprivation of constitutional rights.

### DEFENDANT'S APPEAL FROM JUDGMENT FOR DEPRIVATION OF PLAINTIFFS' 14TH AMENDMENT DUE PROCESS RIGHTS

■ There is plainly enough evidence to justify the conclusion that the Rosses were deprived of due process in the seizure of the 1979 Mercury automobile under the court's ex parte order of delivery. The Ford Motor Credit affidavit upon which the order of delivery was based did not allege particular facts which would authorize the order of delivery without according to the replevin defendants an opportunity to be heard. The order of delivery was therefore void, and the seizure made thereunder was improvident, and was a violation of the Rosses' constitutional rights. *State ex rel. Tallen v. Marsh,* 633 S.W.2d 458 (Mo.App.1982).

■ To make a section 1983 case for damages against Ford Motor Credit, however, it is not enough to show that Ford Motor Credit deprived them of their constitutional rights in the seizure of their automobile. The Fourteenth Amendment, and section 1983 (which is intended to implement the Fourteenth Amendment, and is coterminous with it, see *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 934–35, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982)), are not aimed at private action, no matter how unlawful and discriminatory it may be. It is aimed, rather, at action "under

---

**2.** Our determination that plaintiffs made no submissible case on the section 1983 claims obviates the need to deal with Ford Motor Credit's claims of error in the court's failure to submit their good faith defense, see *Wyatt v. Cole,* 994 F.2d 1113 (5th Cir.1993), and their claim that the evidence supported no punitive damages submissions on those counts. Also eliminated from consideration is plaintiffs' claim that the trial court erred in denying their application for attorney's fees.

color of state law," or "state action," which in this case are exactly the same thing. *Lugar*, 457 U.S. at 935, 102 S.Ct. at 2752. It might be explained in these terms: If the State, by an unconstitutional law, custom, or usage, equips or aids the private person to deprive another of his constitutional rights, then the private person and the state are joint-participants in the deprivation of constitutional rights, and the private individual becomes liable under section 1983 for the state's action.

Whether Ford Motor Credit's seizure of the automobile was "state action," or whether Ford Motor Credit was a "state actor," is a pivotal question in this case.

■ If Ford Motor Credit, in securing its pre-hearing order of delivery and in seizing the Rosses' automobile, had acted under an unconstitutional statute or court rule, its action would clearly have been state action. *Lugar*, 457 U.S. at 940, 102 S.Ct. at 2755. *See also North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969).[3]

The replevin rule[4] under which Ford Motor Credit proceeded, though, is not unconstitutional. The rule does not violate due process standards. We specifically so held in *State ex rel. Tallen*, 633 S.W.2d at 460–62. The Rosses in their brief in this court make no claim that the rule is unconstitutional. Ford Motor Credit simply failed to comply with the rule by alleging specific facts which would have supported an ex parte order of delivery. Ford Motor Credit's failure to comply with the requirements of the replevin rule gives the Rosses no section 1983 claim for damages. Ford Motor Credit's action was not state action, but was private action, with which section 1983 has nothing to do. *Lugar*, 457 U.S. at 940, 102 S.Ct. at 2755.

The replevin rule, then, furnishes the Rosses no ground for claiming that Ford Motor Credit's action was state action, for Ford Motor Credit's action did not comply with the replevin rule but was in violation of it. Ford Motor Credit only misused a valid state rule with respect to pre-hearing seizure of replevined property. This gives the Rosses no section 1983 claim for damages against Ford Motor Credit. *Hassett v. Lemay Bank & Trust Co.*, 851 F.2d 1127, 1129 (8th Cir. 1988).

■ The Rosses turn then to another part of section 1983 to find state action on Ford's part. They turn to the "custom or usage" part of the statute. Their argument is that the issuance of the invalid order of delivery by Judge Gant, and the ensuing improvident seizure of their automobile, was "under color of (a) ... custom or usage" of the state. Their problems (and ours) are two—first, to find that the invalid order and unconstitutional seizure were in pursuance of a state custom or usage, and, second, as in the case of action taken in pursuance of a statute, that Ford Motor Credit was a "state actor."

For reasons we explain in the following paragraphs, we hold: granting pre-hearing orders of delivery upon factually inadequate applications, if a "custom or usage" in replevin cases in the Circuit Court of Jackson County, was, first, not a custom or usage *of the state*, and, second, the invalid pre-hearing order in the present case was in any event not caused by the custom or usage.

We are unable to see that the invalid order in this case was in any way caused by a "custom or usage" of any kind. It is true there had been over a space of three years, 38 ex parte orders issued by various judges of the Jackson County Circuit Court on affidavits which suffered the same deficiency as the one in this case, namely, the absence of specific facts supporting the claim for imme-

---

**3.** While *North Georgia Finishing, Mitchell,* and *Sniadach* are not section 1983 cases, but are cases finding the respective statutes unconstitutional in the original proceedings instituted by the creditor against the debtor, the *Lugar* opinion says that it was a necessary assumption in those holdings that the creditor's action was state ac-

tion. *Lugar*, 457 U.S. at 932–33, 102 S.Ct. at 2751–52.

**4.** A statute and a court rule are treated alike for our purposes. *State ex rel. Tallen*, 633 S.W.2d at 460.

diate possession.[5] In order to make a case under the "custom or usage" part of section 1983, the Rosses must have shown that the custom or usage was "the moving force [behind] the constitutional violation," that it "actually caused" the deprivation of constitutional rights. *Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). But none of the invalid orders was referable to, or in pursuance of, any "custom or usage." Each such order was referable to, and in pursuance of, a replevin procedure which was set forth in the court rule, which, as we have noted above, was a valid and constitutional rule. In all other ways, each case was independent of all the others; an earlier order had no precedential value to be followed in a subsequent order. It is not shown that any judge, in signing any one of the invalid orders, knew of any of the other orders—even of those signed by himself. The attorney, or attorneys, who prepared the affidavits, and the respective judges who signed the ex parte orders, in each case misinterpreted the replevin rule. They supposed, incorrectly, that the rule allowed conclusory statements of fact to support plaintiff's claim for immediate possession to the property. In any case, it was open to a lawyer drafting the affidavit to have interpreted the rule correctly and might have alleged particular facts in his affidavit, or a judge might have declined to issue the order except upon sufficiently specific factual allegations. It was open to any defendant to gain relief from an unconstitutional order from the same judge who issued it. In this case, as a matter of fact, the order of delivery was quashed May 29, 1980, upon the Rosses' motion in the replevin case, for insufficiency of the affidavit in its factual allegations under Rule 99.03. (Ford Motor Credit

had in the meantime, on April 9, 1980, voluntarily redelivered the Mercury to the Rosses.)

The Rosses' argument supposes that the mere repetition of orders shows a custom or usage which can be attributed to the state, so that Ford Motor Credit became a state actor when it employed the custom or usage to deprive the Rosses of their constitutional rights. Repeated acts may in some circumstances show a custom or usage. That is not enough, however, to show that the custom or usage was that of the *state*. The custom or usage, to constitute state action, must spring from a state policy.[6] It would be an odd thing that judicial errors on the trial court level could be held to represent a policy of the state.

We have read most carefully *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), looking both for its factual analogy to the present case, and for its language. We do not believe *Adickes* aids the Rosses. *Adickes* was a section 1983 claim against a private defendant, S.H. Kress and Company, for refusing lunch counter service to a white woman in the company of black companions. Plaintiff Adickes when she left the store was arrested on an unfounded charge of vagrancy, by a policeman who had perhaps been inside the store when the plaintiff was refused service. The trial court had rendered summary judgment for Kress and against the claimant. The Supreme Court reversed and remanded. The Court observed the plaintiff might be able to prove some "understanding" between the waitress and the policeman that plaintiff had not been served. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608. The Court held that Kress's discriminatory act would constitute

---

**5.** Plaintiffs proved that over a period of three years, in 38 different cases in which Ford Motor Credit was the plaintiff, 15 different judges of the Jackson County Circuit Court had issued prejudgment orders of delivery in replevin cases upon applications which, like the *State ex rel. Tallen* application and like the one in the present case, were legally insufficient in their statement of supporting facts. Three of the 15 judges had each signed five of the orders of delivery. Five of the 15 judges had signed only one. Four of the orders were in 1979, 19 in 1980, and 15 in 1981.

**6.** Proof of repeated acts (of constitutional violations) has been made in some cases to show notice to the responsible policy makers of the state. If the responsible policy makers fail to take action to prevent continued constitutional violations, then a plaintiff has shown state action, which may be actionable under section 1983. *See Andrews v. City of Philadelphia,* 895 F.2d 1469 (3rd Cir.1990); *Herrera v. Valentine,* 653 F.2d 1220 (8th Cir.1981).

state action "if she proves that Kress refused her service because of a *state enforced custom* of segregating the races in public restaurants." *Id.* at 171, 90 S.Ct. at 1615 (emphasis ours.) Plaintiff Adickes could show state action if "the racially discriminatory act by the private party is *compelled by a statutory provision*" or by a "*custom having the force of law.*" *Id.* (emphasis ours). We fail to find any "state enforced custom" in the present case, or any "custom having the force of law."

■ We have been unable to find any definition by which one could identify a "custom or usage of (the) state" which, upon its causing the deprivation of constitutional rights, would give rise to a section 1983 action. It would be a rare case where the orders of a nisi prius judge, acting in a judicial capacity, with subject matter jurisdiction, in a dispute between litigants, could be characterized as action of the state. A judge, while in a sense a state official, is not a policy maker of the state. He stands apart from the state. He is no servant of the state. His fealty is first to the constitution of the nation and second to the constitution of the state. When the state and state officials are parties to litigation before him, they stand on level footing with the citizen.[7]

In sum, there is no evidence that Ford Motor Credit was in any sense a state actor in depriving the Rosses of their 14th Amendment Constitutional due process rights.

### DEFENDANT'S APPEAL FROM JUDGMENT FOR DEPRIVATION OF 4TH AMENDMENT RIGHTS AGAINST UNREASONABLE SEARCH AND SEIZURE

■ We now take up the Rosses' separately submitted claim that Ford Motor Credit violated their 4th Amendment rights against unreasonable search and seizure. This claim was based upon the actual taking of possession of the 1979 Mercury from the Rosses' locked garage. The trial court, as earlier noted, directed a verdict for the Rosses on

liability, and submitted only actual and punitive damages.

The jury, also as earlier noted, by its verdict awarded plaintiffs actual damages of $150 and $2,500,000 punitive damages.

There is evidence that the procedure followed by the deputies in this case in the execution of the order of delivery—that is, in standing by while a locksmith opened the door, and allowing the plaintiff to take possession of and remove the property described in the order of delivery—was the usual and ordinary procedure followed by Jackson County process servers in executing replevin orders. The Rosses claim this evidence shows an unreasonable search and seizure within the meaning of the 4th Amendment, and that this violation of their constitutional rights was caused by a state custom or usage within the meaning of section 1983.

The seizure of the automobile from the Rosses' house was not a violation of their 4th Amendment rights. The procedure was justified by section 105.240, RSMo.1986. The Rosses do not claim that section was unconstitutional. The 4th Amendment protects against *unreasonable* searches and seizures. The action of the officers was not unreasonable. They acted in compliance with a court order of delivery which was fair on its face. *See Stafford v. Muster,* 582 S.W.2d 670, 681 [29] (Mo. banc 1979). *Soldal v. Cook County,* —— U.S. ——, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992), does not help the Rosses. There the sheriff's deputies acted without any court order, aiding a landlord to evict a tenant. Said the court:

Assuming for example that the officers were acting pursuant to a court order, as in *Specht v. Jensen,* 832 F.2d 1516 [ (10th Cir.1987) ], or *Fuentes v. Shevin,* [407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556] (1972) ..., and as often would be the case, a showing of unreasonableness on these facts would be a laborious task indeed. Cf. *Simms and Wise v. Slacum,* 3 Cranch 300, 301, 2 L.Ed. 446 (1806).

---

7. The judge's role as a "policy maker," or as an "appointee on the policy making level," as the latter phrase is used in the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–24, is

discussed in *Gregory v. Ashcroft,* —— U.S. ——, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), with the conclusion that judges do not come within the term.

*Soldal,* —— U.S. at ——, 113 S.Ct. at 549. Plaintiffs have not accomplished the "laborious task" of showing an unreasonable search and seizure.

## PLAINTIFFS' APPEAL FROM JUDGMENT FOR FORD MOTOR CREDIT ON ABUSE OF PROCESS CLAIM

■ The Rosses appeal from a judgment in favor of Ford Motor Credit on the Rosses' claim for abuse of process in serving the pre-hearing order of delivery. The trial court directed a verdict for Ford Motor Credit on this count, and it was not submitted to the jury.

■ The trial court ruled correctly that the Rosses did not make a submissible case against Ford Motor Credit for abuse of process in the replevin action. The distinctive element of an abuse of process cause of action is that the process was intended, not for the ostensible purpose, but for some collateral, ulterior motive. "The essence of abuse of process is not the commencement of an action without justification, but it is the misuse of process for an end other than that which it was designed to accomplish." *Guirl v. Guirl,* 708 S.W.2d 239, 245 (Mo.App.1986). *See also Wells v. Orthwein,* 670 S.W.2d 529, 533 (Mo.App.1984).

Two federal district court cases, with facts and legal claims much like those of the present case, have denied abuse of process claims on the ground there was not shown any improper collateral purpose in initiating an attachment procedure (*Antelman v. Lewis,* 480 F.Supp. 180, 186–87 (D.Mass.1979)), and a garnishment procedure (*Jordan v. Berman,* 758 F.Supp. 269, 280–81 (E.D.Pa.1991)).

In this case, there is no evidence Ford Motor Credit had any motive for the institution of the replevin suit other than to gain possession of the 1979 Mercury automobile.

Judgment in favor of Ford Motor Credit on abuse of process count is affirmed.

## FORD MOTOR CREDIT'S APPEAL FROM CONVERSION CLAIM JUDGMENT

The Rosses' petition in Count VII made a claim of conversion of the Mercury automobile by Ford Motor Credit. The jury awarded the Rosses actual damages of $7,000 and punitive damages of $1,000,000. The trial court subsequently ordered that the actual damage award by reduced to $6,500, the maximum amount supported by the evidence. Ford Motor Credit appeals, claiming that the evidence did not make a submissible case of conversion against it, and claiming that, if the evidence made a submissible case of conversion against it, it did not justify the submission of punitive damages.

■ We take up first the Rosses' conversion claim against Ford Motor Credit. Ford Motor Credit, tacitly acknowledging the nullity of the order of delivery under which it took possession of the car from the Rosses, does not claim it is shielded from the conversion claim by the order of delivery.

Ford Motor Credit says it had a right to possession of the car under its security agreement executed by the Rosses, which Ford Motor had obtained by assignment from North Hills Lincoln Mercury. The Rosses say, however, that there was no security agreement—that the promissory note and the security agreement were forged. If forged, they were void, and the security agreement gave Ford Motor Credit no claim to the possession of the car. Section 400.3–104, RSMo.1986, *Universal C.I.T. Credit Corp. v. Hudgens,* 234 Ark. 668, 1127, 356 S.W.2d 658 (1962), 3A C.J.S. *Alteration of Instruments* § 6 (1973). The jury, as shown by its verdict in favor of the Rosses, believed the Rosses' version.

Next, Ford Motor Credit says that if the Rosses had not purchased the Mercury from North Hills Lincoln Mercury, as they testified they had not, it still belonged to North Hills Lincoln Mercury, and Ford Motor Credit was entitled to possession of the Mercury under the lien of a floor plan financing arrangement Ford Motor Credit had with North Hills Lincoln Mercury. On the existence of the alleged floor plan arrangement, the record contains only the oral testimony of Ford Motor Credit's assistant manager that "the dealer closed and we took possession of the vehicles we had financed with them." We do not know if the Mercury was included

in the floor plan; there is no testimony that it was. Ford Motor Credit never based its claim to possession of the Mercury on its North Hills floor plan arrangement, but always and only upon the security agreement allegedly given by the Rosses. The floor plan arrangement, so far as this record shows, gave Ford Motor Credit no right to possession of the Mercury.

The Rosses' evidence, if believed, leads to the conclusion they had possession of the car as bailees from North Hills Lincoln Mercury. It had been delivered into their possession by North Hills for driving and testing, and the Rosses had delivered possession of their own 1976 Buick to North Hills. Their testimony was that they had attempted to return the Mercury to North Hills to reclaim their 1976 Buick, but had been put off. North Hills had not demanded the return of the Mercury from the Rosses. Apparently, North Hills went defunct during the time the Rosses had the Mercury in their possession. We are unable to see from the evidence that the Rosses were not in rightful possession of the Mercury. The Rosses' rightful possession of the Mercury was sufficient to sustain their conversion claim. *Farmers & Merchants v. Borg–Warner,* 665 S.W.2d 636, 640 (Mo.App. 1983), *Price v. Ford Motor Credit Co.,* 530 S.W.2d 249, 255 (Mo.App.1975), 18 Am.Jur. 2d, *Conversion* §§ 76, 77 (1985). As between North Hills and the Rosses, we might have a different case. But Ford Motor Credit— given the invalidity of the security agreement—had no right to the possession of the Mercury. When Ford Motor Credit took the car from the Rosses' possession without the consent of the Rosses, and against their will, it converted the Mercury to its own use. *Maples v. United Savings & Loan Ass'n,* 686 S.W.2d 525, 527 (Mo.App.1985); *Farmers,* 665 S.W.2d at 636.

Ford Motor Credit claims the Rosses' verdict against Ford Motor Credit for conversion of the Mercury is inconsistent with their recovery against North Hills Lincoln Mercury for conversion of the 1976 Buick. The effect of this, Ford Motor Credit says, is that the Rosses had judgments for the full value of the Mercury (against Ford Motor Credit), and for full value of the 1976 Buick (against

North Hills Lincoln Mercury). If the two verdicts are inconsistent, Ford Motor Credit has not preserved that point for appeal. It did not request at trial any election between these two claims before submission, nor does it object on appeal to the conjunctive submission of both, as opposed to an alternate or disjunctive submission. It made no claim for inconsistency after the verdicts were returned and before the jury was discharged. *See Douglass v. Safire,* 712 S.W.2d 373, 374 (Mo. banc 1986); *Edna Enters., Inc. v. Spirco Envtl., Inc.,* 853 S.W.2d 388, 391 (Mo.App. 1993).

As to the conversion count, the judgment is affirmed as to actual damages reduced to zero, however, by the set-off applied by the court, as hereinafter discussed.

■■■■ While the Rosses made a submissible case for conversion of the Mercury automobile, they did not make a case for the submission of punitive damages. In reviewing this issue, we look at the evidence which is favorable to the submission of punitive damages, disregarding all evidence and inferences which are adverse thereto. *Haynam v. Laclede Elec. Coop., Inc.,* 827 S.W.2d 200, 205 (Mo. banc 1992); *Walker v. Gateway Nat'l Bank,* 799 S.W.2d 614, 617 (Mo.App. 1990). We are unable to find in the evidence, either by direct evidence or by inference, the evidence that would show Ford Motor Credit's conduct was "outrageous because of (its) evil motive or reckless indifference to the rights of others." *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989); MAI No. 10.01; *compare with Clayton X–Ray Co. v. Professional Sys. Corp.,* 812 S.W.2d 565, 567 (Mo.App.1991). The Rosses' own evidence shows nothing more than that Ford Motor Credit initiated a replevin suit for possession of the Mercury, and gained possession of the car. When we are considering the submissibility of an issue, of course, we take only the evidence that tends to support the submission and disregard the rest. If Ford Motor Credit's evidence contains anything to aid the Rosses, the Rosses are entitled to its benefit. We find nothing in Ford Motor Credit's evidence to support the punitive damages submission. Ford Motor Credit knew of the Rosses' claim that the promissory note and

security agreement, which belonged to Ford Motor Credit by assignment from North Hills Lincoln Mercury, was a forgery. Ford Motor Credit did not ignore this claim. There was nothing in the documents themselves that betrayed the fact they were forged.[8] Ford Motor Credit consulted the Rosses' (then) attorney, who was unable to support the Rosses' claim of forgery. It did not attempt self-help. It turned the matter over to its attorney, who proceeded to file a replevin suit. Ford Motor Credit's pleadings appeared to be regular, or were at least not obviously irregular. *State ex rel. Tallen,* 633 S.W.2d 458, decided by this court in 1982, with its requirement that particular facts had to be alleged in an affidavit for pre-hearing order of delivery, was yet two years in the future. While Ford Motor Credit's order of delivery, signed by Judge Gant, was void because of the absence of particular fact allegations in the supporting affidavit, and while it furnishes Ford Motor Credit no defense to the Rosses' claim of conversion, it has a definite bearing upon Ford Motor Credit's liability for punitive damages. It tends to negate an "evil motive" on Ford Motor Credit's part, and "reckless indifference to (the Rosses') rights."

The award of punitive damages on the conversion count is reversed.

### *FORD MOTOR CREDIT'S APPEAL AND THE ROSSES' CROSS–APPEAL FROM LIBEL JUDGMENT*

One count of the Rosses' petition charged Ford Motor Credit with libel. The submission to the jury was that Ford Motor Credit had knowingly or recklessly falsely reported to the Credit Bureau of Kansas City that it "had repossessed the plaintiff's automobile and that plaintiff had redeemed it."

After Ford Motor Credit repossessed the Mercury from the Rosses, it reported the same to the Kansas City Credit Bureau, by means of a form made for the purpose. The repossession was reported by use of three letters, "RPO", which meant, according to a printed Credit Bureau key, "repossession." Later, after Ford Motor Credit had returned the Mercury to the Rosses on April 9, 1980, it apparently reported that fact to the Credit Bureau. Two years later, the Rosses applied to Blue Ridge Bank for an automobile loan. The Credit Bureau report to Blue Ridge Bank on the Rosses' credit history showed the Ford Motor Credit transaction as "RRE," which meant, once again according to the printed key, "Repossession. Redeemed." Blue Ridge Bank because of this Credit Bureau report denied the Rosses' application for a motor vehicle loan. The denial was communicated to the Rosses on a printed form on which the reason for denial of credit was indicated by a check mark in a box before the printed words: "Garnishment, attachment, foreclosure, repossession, or suit."

The jury returned a verdict for the Rosses against Ford Motor Credit for $10,000 actual damages and $1,000,000 punitive damages. The trial court reduced the actual damage award to $1.00. Ford Motor Credit appeals from the judgment, claiming plaintiffs made no submissible case of libel against Ford Motor Credit. The Rosses also appeal from the judgment, charging the trial court with error in reducing the actual damages award to $1.00.

We hold the evidence made no submissible case of libel against Ford Motor Credit.

The Rosses see a libellous falsehood in the word "repossession," when the Mercury had in fact been replevined. We do not see any significance whatever in that distinction in terminology. Property might be repossessed by self-help, or it might be repossessed through legal procedures. The word "repossession" fits either case. There is no evidence that the one carries any greater or less stigma than the other.

---

8. A layman could not tell that the signatures of the Rosses had been forged. Ford Motor Credit's handwriting expert, Herman B. Davis, testified that the signature exemplars of Mr. Ross matched the signature of the Rosses on each of several documents, and thus, were penned by the same persons. On the other hand, the Rosses' expert, Avis Odenbaugh, testified that the signatures were not those of the Rosses. The Rosses' expert testified that only an expert could determine whether or not the signatures were forgeries.

But, the Rosses also argue that the addition of the "redeemed" compounded the injury to their credit. They believe (to amplify their argument somewhat) this would have been interpreted to mean they were delinquent in their payments, and then that they brought their account current after the repossession of the automobile by Ford Credit. This would be an admission that they owed the money represented by the promissory note, which they in fact did not owe, and did not admit owing.

That the "redeemed" part of the Credit Bureau report had anything at all to do with Blue Ridge Bank's denial of credit to the Rosses there is no evidence at all. It was the "repossession" part of the report that caused the bank to turn down the Rosses' application for credit. The bank's denial of credit notice to the Rosses gave as its reason, by checking a box before the printed words: "Garnishment, attachment, foreclosure, repossession, or suit." L. Keith Lightfoot, the bank loan officer who disapproved the Rosses' credit application, testified there was no other reason for the denial of credit than the reason checked on the notice.

■ We hold, therefore, that the Ford Motor Credit report of "repossession" of the Mercury was true. Truth is a complete defense to a charge of libel. *Pulliam v. Bond,* 406 S.W.2d 635, 642 (Mo.1966); *Irwin v. Wal–Mart Stores, Inc.,* 813 S.W.2d 99, 102 (Mo.App.1991).

■ With respect to the "redeemed" part of the report, there was no damage. The Rosses designate their libel case as a case of libel per quod.[9] The action for libel per quod must allege and prove special damages. *Capobianco v. Pulitzer Pub. Co.,* 812 S.W.2d 852, 855 (Mo.App.1991), *citing Swafford v. Miller,* 711 S.W.2d 211 (Mo.App.1986). Damages there were none.[10]

The judgment in favor of the Rosses on their libel count is reversed.

### PLAINTIFFS' APPEAL FROM CONVERSION CLAIM JUDGMENT

■ The Rosses say the court erred in reducing to zero their $6,500 verdict in their claim against Ford Motor Credit for conversion of the 1979 Mercury. The court made this ruling on the ground that the Rosses had fully recovered their damages in a settlement of their claims against notary public F.J. Foster and his bondsman, Zurich American Insurance Company, and First National Bank of Independence for various derelictions and breaches of duty surrounding the forged transfer of title to the Rosses' 1976 Buick. The Rosses testified the 1976 Buick had a market value of $6,500. The amount of the settlement was $11,000, which the court partially set off against the $6,500 conversion verdict against Ford Motor Credit, reducing the judgment to zero.

The court took this action to prevent the Rosses' making a duplicative recovery. When they received the full value of their 1976 Buick, as they did by the $11,000 settlement, they received the full amount of their damages. The Rosses testified, in effect, they were holding the 1979 Mercury only for security for the return by North Hills Lincoln Mercury of their 1976 Buick. When they received the admitted full value of the 1976 Buick, and more, they had recovered in full their damages on this aspect of the case. It does not matter that the torts were different torts, committed by different parties. The Rosses were not entitled to duplicative recoveries. "We ... reiterate the caveat that duplicate or overlapping damages may not be obtained." *Stafford,* 582 S.W.2d at 679. The court had equitable jurisdiction to make the set-off to avoid the result that the

---

**9.** Libel per quod is based upon words which, although not defamatory on their face, can be made defamatory by reference to extrinsic evidence. *Capobianco v. Pulitzer Pub. Co.,* 812 S.W.2d 852, 855 (Mo.App.1991), *citing Brown v. Kitterman,* 443 S.W.2d 146 (Mo.1969).

**10.** The Rosses, in their motion for rehearing, or in the alternative for transfer to the Supreme

Court, call our attention to *Nazeri v. Missouri Valley College, et al.,* 860 S.W.2d 303 (Mo. banc 1993), decided during the pendency of this appeal. That case abolishes the distinctions between libel per se and per quod, but holds that actual damages must be shown in all cases. The decision has no significance in the present case.

Rosses would make duplicate recoveries for what was essentially the same loss. *Watson v. Harris,* 435 S.W.2d 667, 676 (Mo.1968).

The Rosses point out that in their petition against notary public F.J. Foster and his bonding company, Zurich–American Insurance Companies, they asked damages, in addition to the value of their 1976 Buick, for loss of use of the Buick, attorney's fees and litigation expenses, and for emotional distress and mental anguish. In their petition against First National Bank of Independence they asked damages for—in addition to loss of possession of their 1976 Buick—deprivation of use of the Buick, mental anguish and emotional distress, litigation expenses and attorney's fees, and punitive damages. They say the court could not tell what items of damage were included in the $11,000 settlement of these two counts. The court could not therefore tell whether the $6,500 value of the 1976 Buick was included in the $11,000 settlement, and could not determine that a $6,500 recovery for the conversion of the 1979 Mercury was duplicative. There is a certain theoretical logic in this, but the trial court was not obligated to apply theoretical logic over practical sense. The settlement agreement, if there was one, was not before the court. The Rosses might have produced it and placed it in the record, but did not do so. The loss of the 1976 Buick was the only tangible loss suffered by the wrongdoing of the defendants in Count X and Count XI. The court cannot be convicted of error in rejecting the notion that the $11,000 settlement did not include the value of the 1976 Buick.

The judgment for actual damages of zero on the conversion claim against Ford Motor Credit, after setting off the amount received by the Rosses in settlement of Counts X and XI, is affirmed.

### CONCLUSION

The judgment for plaintiffs on Count III for actual and punitive damages for deprivation of plaintiffs' 14th Amendment Constitutional rights is reversed. The judgment for plaintiffs on Count IV for actual and punitive damages for deprivation of plaintiffs' 4th Amendment Constitutional rights is reversed. The judgment for defendants on plaintiffs' abuse of process claim is affirmed. Judgment for plaintiffs on conversion claim is affirmed as to actual damages, as reduced to zero by the trial court, and judgment reversed as to punitive damages. The judgment for plaintiffs for actual and punitive damages on libel claim reversed.

Case remanded for entry of a new judgment in accordance with the foregoing opinion.

All concur.