**Jerry J. KERR, et al., Appellants,**

v.

**Carl E. JENNINGS, et ux., Respondents.**

**No. WD 47369.**

Missouri Court of Appeals,
Western District.

Aug. 30, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 4, 1994.

Application to Transfer Denied
Nov. 22, 1994.

Don R. Lolli, Kansas City, for appellants.

Elvin S. Douglas, Jr., Harrisonville, for respondents.

Before ULRICH, P.J., and BRECKENRIDGE and SPINDEN, JJ.

BRECKENRIDGE, Justice.

This appeal involves real estate owned by Jerry J. Kerr and Dea Daniels (the Kerrs) which is subject to a non-exclusive easement held by Carl E. and Mary Jennings (the Jenningses). The Kerrs filed a five-count petition against the Jenningses seeking a declaratory judgment, a permanent injunc-

tion, actual, statutory and punitive damages for trespass and property damage. The Kerrs also filed a motion asking the trial court to find the Jenningses in contempt for allegedly violating a temporary restraining order and a preliminary injunction. After a hearing on the motion for contempt, the trial court granted the Kerrs' request for a declaratory judgment and entered a permanent injunction but did not award the Kerrs damages, declined to make its injunction permanent in all respects, and denied the motion for contempt. The Kerrs raise four points on appeal, contending that the trial court erred (1) in failing to award the Kerrs damages; (2) in failing to find the Jenningses in contempt for violating an April 17, 1992, preliminary injunction; (3) in failing to find the Jenningses in contempt for violating an August 14, 1991, temporary restraining order; and (4) in prohibiting the placement of gates at the entrance to and exit from the easement and in failing to make the provisions in its preliminary injunction regarding the placement of those gates permanent. The judgment of the trial court is affirmed.

The Kerrs and the Jenningses purchased adjoining tracts of land in Grandview, Missouri, from Sunrise Dairy Farms at an auction on December 19, 1987. Both the Kerrs and the Jenningses purchased two forty-acre lots. The four lots lie south of Missouri Highway 50, which runs east-west, and west of Kelly Road, a public road and north-south thoroughfare. The Kerrs' property is bounded on the east by Kelly Road. The two lots purchased by the Jenningses are landlocked and have access to Kelly Road only through an easement which bisects the two lots purchased by the Kerrs. All parties had knowledge of the easement prior to the sale.

On January 20, 1988, Sunrise Dairy Farms filed a Declaration of Easement providing that the easement begin at Kelly Road and run west, equally separating the Kerrs' two lots at a width of sixty feet, and then run further west across the northern part of the Jenningses' lots. See Appendix A. The Declaration creates a non-exclusive, perpetual easement for the purpose of pedestrian and vehicular ingress and egress to and from the respective tracts over the easement area

and for the purpose of facilitating the installation, maintenance, and replacement of utilities for the tracts served by the easement. The Declaration also provides that "the owners of each of the tracts agree that except when necessitated by repairs or maintenance, neither shall block, obstruct, hinder or interfere with the easement area or the permitted traffic thereon."

When the Kerrs and the Jenningses first purchased their property, there was no actual roadway in existence over the easement. Rather, a fence (the "centerline fence") equally dividing the Kerrs' two tracts ran down the center of the easement. Vegetation, including trees and shrubs, grew along this east-west centerline fence.

In the spring of 1988, the Jenningses commenced the construction of a road on the easement between Kelly Road and their property. The Jenningses first created an entrance from Kelly Road by cutting a swath centered on the easement eighteen to twenty feet wide through the hedgerow which ran along the Kelly Road ditch. In creating the entrance Mr. Jennings removed ten to twelve elm, hedge, and hackberry trees, all within the easement.

The Jenningses next began grading a roadbed within the easement. They graded a fifteen-foot wide road primarily to the south of the centerline fence. Mr. Jennings, however, did remove part of the centerline fence.

On the west side of the Kerrs' property lie several ponds. The easement runs between one larger pond on the north and two smaller ponds to the south. A portion of the banks of the dams of these ponds are within the easement. Mr. Jennings testified that in constructing the roadway he removed only a small part of the dams which encroached upon the easement. Mr. Jennings also stated that he cleared and slightly enlarged a spillway/ditch south of the larger pond.

Beginning in the summer of 1988, the Kerrs allowed Allen M. "Bill" Galloway, as their tenant, to use both of the Kerrs' forty-acre lots for pasturing cattle, harvesting hay, and for other agricultural purposes. Mr. Galloway was the Kerrs' tenant from the

summer of 1988 until the fall of 1991. He generally pastured his cattle on the property from the last of April or beginning of May until sometime in December of each year. Although Mr. Galloway had permission to use both of the Kerrs' lots, he primarily kept the cattle on the south forty-acre lot and used the north forty acres for hay. Because there was usually not enough water in the southern ponds during the summer months, though, Mr. Galloway had to move his cattle across the easement several times daily to water the cattle from the larger northern pond.

At the time that the parties purchased their lots, there was a wooden gate at the western end of the easement. Mr. Galloway replaced this wooden gate with a hinged metal gate in 1989. After creating the entrance from Kelly Road in 1988, Mr. Jennings installed a metal gate at the opening on the eastern end of the easement.

In 1989, Mr. Jennings removed the metal gate at the Kelly Road entrance and Mr. Galloway replaced it with another metal gate. From 1989 until 1991, the Kelly Road gate remained in place during the time Mr. Galloway pastured his cattle on the Kerrs' property. Mr. Galloway removed the gate when he took his cattle home in December of each year and reinstalled it each spring when he brought his cattle back to the Kerrs' lots.

There was evidence that Mr. Jennings may have removed the gates at both ends of the easement sometime in 1991. Mr. Galloway testified that Mr. Jennings admitted removing the gates in April or May of 1991.

On August 14, 1991, the Kerrs filed an application for a temporary restraining order seeking to enjoin the Jenningses from removing the gates at both ends of the easement. The Jenningses did not object to the request for a temporary restraining order and did not present any evidence at the August 14, 1991, hearing on the Kerrs' application. After the hearing, the trial court entered a temporary restraining order prohibiting the Jenningses from removing the gates.

Mr. Jennings testified that he removed the gate at the eastern end of the easement at the Kelly Road entrance in November of 1991 in order to allow construction vehicles to enter the easement and travel through to his property. According to Mr. Jennings, at the time he removed the gate there were no cattle on the Kerrs' property. The gate was down for approximately two weeks, after which time Mr. Jennings replaced the metal gate with a cable or wire gate.

The Jenningses eventually poured a concrete pad at the Kelly Road entrance onto the easement. Sometime before April of 1992, Mr. Jennings placed some rock and concrete along the easement roadway "to fill the low spot and level up the road."

After the Jenningses removed portions of the centerline fence, Mr. Galloway built a new fence running east to west on the Kerrs' land on the northern edge of the easement. Mr. Galloway also installed an electrical fence running east to west adjoining the southern edge of the easement.

The new fences on the northern and southern borders of the easement were allegedly removed and/or damaged at times, allowing Mr. Galloway's cattle access to areas where they were not wanted. The Kerrs and Mr. Galloway believed that Mr. Jennings was responsible for the removal and damage of these fences.

On March 24, 1992, the Kerrs filed a petition for a preliminary injunction in which they asked the court (a) to enjoin the Jenningses from placing more concrete and asphalt on the easement and order them to remove the existing asphalt and concrete; (b) to prohibit the Jenningses from enlarging the spillway/ditch and require them to fill the existing trench; (c) to enjoin the Jenningses from destroying electric fences on the Kerrs' property; (d) to order the Jenningses to reinstall the hinged gate on the east end of the easement, keep the gate closed and locked, and provide a key to the Kerrs; and (e) to enjoin the Jenningses from placing any additional material on the easement until a permanent injunction is heard. After a hearing on the petition, the court issued a prelim-

inary injunction on April 17, 1992,[1] enjoining and prohibiting the Jenningses from engaging in the following activities:

1. Placing any more concrete, asphalt, stone or other rubble on the easement crossing [the Kerrs'] property. [The Jenningses] shall, within 30 days of the date of this Order, remove such concrete, asphalt, stone or other rubble from the easement . . . or, in the alternative, [the Jenningses] shall cover such concrete, asphalt, stone or other rubble with sufficient dirt in such a manner as to prevent it from being a hazard to cattle crossing the easement. . . .

2. [The Jenningses] shall, with [sic] 30 days of the date of this Order, place a culvert in the existing ditch along the south side of the easement and cover the culvert with dirt so that cattle may travel without hazard across the easement. . . .

3. Disturbing in any way the fence which currently divides the [Kerrs'] southern 40 acres and northern 40 acres.

4. Removing, damaging, destroying or disturbing any hinged gates which the [Kerrs] may erect in the Kelly Road entrance/exit to the easement. . . .

5. [The Jenningses] shall erect and maintain a gate at the entrance/exit of the easement at the west side of plaintiffs' property, and this gate shall remain closed at all times, except as is necessary to allow passage of traffic through it.

6. Further grading, digging or otherwise reducing the embankments of any of the ponds on [the Kerrs'] property.

The trial court subsequently issued a supplemental order to its preliminary injunction in which it stated that "[n]othing in the preliminary injunction . . . shall preclude either party from constructing a hard surface roadway upon the easement. . . . The court envisions such roadway surface could be made of concrete, asphalt, gravel or such other material customarily used in surfacing roadways." The Jenningses did eventually gravel a roadway adjoining the dirt roadway they originally constructed.

On April 23, 1992, the Kerrs filed a five-count petition against the Jenningses. Count I sought a judgment declaring the rights and obligations of the parties with regard to the use and improvement of the easement. Count II sought a temporary restraining order and preliminary and permanent injunction enjoining the Jenningses from denying the Kerrs free access to the easement and from any further excavation on the easement which would affect the contour and condition of the Kerrs' property. In Count III, the Kerrs requested damages, trebled pursuant to § 537.340, RSMo 1986, for trespass. In Count IV, the Kerrs asked the court to award them damages from the Jenningses for the opening and removal of gates and fences. Count V sought punitive damages.

In addition to their answer to the Kerrs' petition, the Jenningses filed in response a two-count counterclaim. In the first count the Jenningses sought damages for the "wrongful conduct of [the Kerrs]" in "unreasonably threaten[ing]" the Jenningses and "unreasonably interfer[ing] with their exercise of the easement rights owned and possessed by [the Jenningses]." The second count sought an order reforming the Declaration of Easement, specifically changing the description of the easement.

On September 25, 1992, the Kerrs filed a motion for contempt. In their motion the Kerrs alleged that the Jenningses had violated the August 14, 1991, temporary restraining order and the April 17, 1992, preliminary injunction.

On November 10 and 12, 1992, the trial court conducted a hearing on the Kerrs' five-count petition, the Jenningses' two-count counterclaim, and the Kerrs' motion for contempt. After hearing all the evidence and viewing the easement and property in question in person, the trial court issued its judgment on December 21, 1992. In its judgment, the trial court granted the Kerrs' request for a declaratory judgment but specifically declared that "[t]he easement is not to be obstructed in anyway by the placement of gates, fences or any other objects at the entrance to or exit from or along the way of the easement." The trial court also entered a permanent injunction enjoining the Jen-

1. The preliminary injunction was not signed and mailed to the parties until June 1, 1992.

ningses from placing more concrete, asphalt, stone, or other rubble upon the easement area except in constructing a road, from digging any more trenches unless reasonably necessary for drainage or maintenance of the roadway, from disturbing or damaging any fences installed by the Kerrs along the easement boundaries, from reducing the embankments of any of the ponds even though the embankments may be upon the easement area, from damaging or removing any trees or vegetation not within the easement area, and from damaging or leaving open any gate in the Kerrs' fence line along the north and south boundaries of the easement area. The trial court ordered that the Kerrs recover nothing for their claims of trespass and interference with the gates and fences and denied punitive damages. The trial court further ordered that the Jenningses receive nothing for their counterclaim for obstruction of the easement and denied the Kerrs' motion for contempt.[2] The Kerrs now appeal the decision of the trial court.

■ Appellate review of this court-tried civil case is governed by the dictates of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The decision of the trial court must be affirmed unless there is no substantial evidence to support the decision, the decision is against the weight of the evidence, or the decision erroneously declares or applies the law. *Id.* at 32.

■ On appeal, the judgment of the trial court is presumed correct. *Sutton v. Goldenberg*, 862 S.W.2d 515, 517 (Mo.App.1993). The appellant bears the burden of demonstrating that the trial court's judgment is erroneous. *United Siding v. Residential Imp. Serv.*, 854 S.W.2d 464, 469 (Mo.App. 1993). Due regard must be given to the trial court's determination of the credibility of witnesses. Rule 73.01(c)(2); *In re Marriage of Lewis*, 808 S.W.2d 919, 922 (Mo.App.1991).

## I.

The Kerrs allege as their first point on appeal that the trial court erred in failing to award them damages for the Jenningses'

conduct. The Kerrs first argue that four of the findings of fact and conclusions of law made by the trial court are against the weight of the evidence. The Kerrs next contend that three of the trial court's findings of fact and conclusions of law misstate or misapply the law.

The four findings of the trial court which the Kerrs claim are against the weight of the evidence are as follows:

14. Some of the earth which was removed or cut into formed the outer edge of the base of two pond dams. Such dirt and earth which were removed or cut into did not damage or compromise the integrity of the dams and did not cause the ponds to lose water.

17. There is no evidence that the [Jenningses'] efforts in preparing the easement for use, including the removal of the fence, trees and earth, were unreasonable or unduly and adversely affected or damaged [the Kerrs'] property outside the easement area.

19. The evidence does not show that [the Kerrs] sustained any damage to their property or the use of their property as a direct result of the action of the [Jenningses] in removing the [Kelly Road] gate. . . .

21. Although [the Kerrs] believe that [the Jenningses] were responsible for the removal and damage of [the] fences [along the southern and northern edges of the easement], the evidence fails to establish who in fact did these things. . . .

The power to set aside a decree or judgment because it is "against the weight of the evidence" should be exercised only "with caution and with a firm belief that the decree or judgment is wrong." *Murphy*, 536 S.W.2d at 32. " 'Weight of the evidence' means its weight in probative value, not its quantity. *Looney v. Estate of Eshleman*, 783 S.W.2d 164, 165 (Mo.App.1990). 'The weight of evidence is not determined by mathematics, but on its effect in inducing belief.' *Id.*" *Lewis*, 808 S.W.2d at 922.

2. The parties agreed in open court on November 10, 1992, that Count II of the Jenningses' counterclaim be sustained and that the Declaration of

Easement be reformed so that the description of the easement would conform to that contained in the Jenningses' counterclaim.

■ In support of their argument that the finding made by the trial court in paragraph 14 of its December 21, 1992 decision was against the weight of the evidence, the Kerrs cite various statements made by either Mr. Kerr or Mr. Galloway that Mr. Jennings cut into the pond dams, that the ponds did not leak until Mr. Jennings cut into the dams, that the ponds now leak, and that Mr. Jennings admitted to Mr. Galloway that he shaved the embankment of one of the pond dams. The Kerrs, however, fail to acknowledge the evidence which supports the decision of the trial court.

While Mr. Jennings did admit that he did some grading work around the ponds, he stated that he took out "very little" dirt around the pond. According to Mr. Jennings, the easement roadway became difficult to travel on during wet weather. In order to provide drainage for the roadway, Mr. Jennings slightly enlarged a spillway/ditch between the road and one of the ponds by cleaning out the dead weeds and grass and removing some of the dirt. Although Mr. Jennings believed that his work may have caused one of the ponds to lose some of its water, he stated that the work did not cause the ponds to leak. An excavation expert who inspected the ponds on November 11, 1992, testified on behalf of the Jenningses that the ponds were not leaking at the time of his visit, that there were not signs that the ponds had leaked previously in the area where the dirt work had been done, and that the dirt work had not affected the integrity of dams. The trial court viewed the property and stated that the viewing was significant in reaching its decision.

■ In maintaining that the finding of the trial court in paragraph 17 concerning the reasonableness of the efforts of the Jenningses in preparing the easement and the effect of those efforts on the Kerrs' property outside the easement area is against the weight of the evidence, the Kerrs again fail to recognize the evidence which supports the trial court's finding. Mr. Jennings admittedly removed a portion of a fence and cut down trees in order to create an entrance from Kelly Road onto the easement and removed part of the centerline fence in order to construct the roadway, but Mr. Jennings testified that he never removed fencing that was not on the easement and that he cut down only trees that were in the path of the easement roadway. Although Mr. Galloway testified that Mr. Jennings told him that he had taken the electric fence on the southern edge of the easement down and put it back up, Mr. Jennings denied doing this, and Mr. Galloway admitted that he never saw anyone disturbing the fence.

■ The Kerrs claim that the trial court's finding in paragraph 19 of its December 21, 1992, order that the Kerrs sustained no damage as a result of the Jenningses' removal of the Kelly Road gate is against the weight of the evidence. The Kerrs allege that as a result of the removal of the gate, they lost rental income from Mr. Galloway, who did not rent pasture land from them after the fall of 1991 because Mr. Galloway "didn't feel comfortable having to drive over there two or three times a day to water [his] cows, which is sixty or seventy miles a day, and wondering whether the gate was shut, whether it was open, or leaning against the fence." The Kerrs also claim they were forced to move hay bales to another farm since they could not keep cattle on the land without the gate up.

The Jenningses admitted that they did not want to have to open and close gates in order to use the easement. According to the Jenningses, the gates were a source of concern for them because Ms. Jennings was under a physician-imposed lifting restriction and Mr. Jennings had a "heart valve condition." Both Mr. and Ms. Jennings, however, testified that Mr. Jennings left the Kelly Road gate open only when there were no cattle on the Kerrs' property. Mr. Jennings testified that he removed the gate only once after the August 14, 1991, temporary restraining order for the purpose of allowing construction vehicles to enter the easement and travel through to his property. According to Mr. Jennings, there were no cattle on the Kerrs' property at the time he removed the gate, and he replaced the gate within two weeks.

■ The fourth finding of the trial court disputed by the Kerrs is the finding in para-

graph 21 that the evidence failed to establish who was responsible for the removal and damage of the fences on the Kerrs' property along the northern and southern edges of the easement. Although the Kerrs and Mr. Galloway believed that Mr. Jennings was responsible for the damage to these fences, Mr. Galloway admitted that he never saw anyone damage the fences, and Mr. Jennings testified that he never damaged the electric fence on the southern edge of the easement and never removed any fence that was not on the easement.

■ The trial court was free to believe all, part or none of the testimony of each witness. *Fowler v. Fowler*, 732 S.W.2d 235, 237 (Mo.App.1987). A review of the evidence as a whole does not leave this court firmly convinced that the trial court's findings in paragraphs 14, 17, 19, and 21 were against the weight of the evidence.

As the second part of their first point on appeal, the Kerrs allege that the following findings of fact made by the trial court in its December 21, 1992, order misstate or misapply the law:

15. [The Jenningses] never cut, damaged, removed or carried away any trees growing on [the Kerrs'] property which were not totally within the easement. [The Jenningses] had the right to cut and remove such trees and other growth within the easement which interfered with their use of the easement and to prepare the easement for the construction of an adequate roadway, including removal of the fence running down the middle of the easement, so that they could access their property at all times and under all weather conditions.

16. [The Jenningses] had the right to restructure the ground and earth within the easement to properly prepare the easement for the construction of an adequate roadway so that they could access their property at all times and under all weather conditions.

17. There is no evidence that [the Jenningses'] efforts in preparing the easement for use, including the removal of the fence, trees and earth, were unreasonable or unduly and adversely affected or damaged

[the Kerrs'] property outside the easement area.

The Kerrs basically contend that the trial court erred in not concluding that Jenningses' use of the easement was unreasonable and not finding the Jenningses liable for trespass.

■ The reasonable use of an easement is a question of fact. *Beiser v. Hensic*, 655 S.W.2d 660, 663 (Mo.App.1983). In a bench-tried case such as this, the trial judge is the finder of fact. *First Nat. Bank of Sikeston v. Goodnight*, 721 S.W.2d 122, 123 (Mo.App. 1986).

The Declaration of Easement gives the Jenningses a nonexclusive, perpetual easement for the purpose of ingress and egress, by foot or by vehicle, to and from their land and for the purpose of facilitating the installation, maintenance, and replacement of utilities for their property. The Declaration specifically provides that except for repairs or maintenance, the land owners "shall not block, obstruct, hinder or interfere with the easement area or the permitted traffic thereon."

■ In general, "the person having the right to use an easement has the right to remove obstructions unlawfully placed thereon, as well as natural obstructions interfering with the use of the easement, so long as there is no breach of the peace." 25 Am. Jur.2d *Easements and Licenses* § 92 (1966). *See also*, 28 C.J.S. *Easements* § 100 (1941). This right is based on the theory that the obstruction "constitutes a private nuisance which the owner of the easement is entitled to abate under the rules applicable to nuisances generally; in doing so, he does not become a trespasser." 25 Am.Jur.2d *Easements and Licenses* § 92 (1966). When the owner of the land has covenanted to keep the easement open, the owner of the easement does not need to bring an action for the breach of the covenant in order to remove the obstruction but may remove it himself or herself. 28 C.J.S. *Easements* § 100 (1941).

■ In the instant case, the Jenningses maintained that the only trees, fences, and earth which were removed were within the easement and were removed in order to con-

struct the easement roadway. The trial court was free to believe or disbelieve both the Jenningses' and the Kerrs' testimony. *See Fowler,* 732 S.W.2d at 237.

Upon reviewing the evidence as a whole, this court concludes that the trial court's finding that the Jenningses' use of the easement was reasonable is supported by substantial evidence, is not against the weight of the evidence, and does not misstate or misapply the law. Point one is denied.

## II.

The Kerrs contend as their second point on appeal that the trial court erred in failing to find the Jenningses in contempt for violating the April 17, 1992, preliminary injunction. The Kerrs allege that the trial court's findings in its December 21, 1992 judgment that the Jenningses attempted to cover the broken concrete and other debris with gravel and installed and covered the culvert within thirty days as ordered in the preliminary injunction was against the weight of the evidence. The Kerrs also claim that the trial court's finding that the Jenningses' conduct since April 17, 1992, did not show any willful or contumacious violation of the orders of the preliminary injunction was against the weight of the evidence and that the trial court abused its discretion in not holding the Jenningses in contempt.

The Jenningses were required by the April 17, 1992, preliminary injunction to remove or cover the concrete, asphalt, stone and other rubble they had placed on the easement crossing the Kerrs' property within 30 days. If they chose to cover the debris, the covering had to be sufficient to prevent the debris from being a hazard to cattle crossing the easement. Mr. Kerr and Mr. Galloway testified that the Jenningses failed to comply with all of the provisions of the preliminary injunction within the thirty-day time limit mandated in the injunction. Mr. Kerr testified that as of July of 1992, concrete debris and wire were still exposed through a thin coating of gravel and that the debris could cause hoof damage to cattle. Mr. Galloway made a similar observation and also believed the state of the easement presented a hazard to cattle.

■ The April 17, 1992, preliminary injunction also compelled the Jenningses to place a culvert in the existing ditch along the south side of the easement and cover the culvert with dirt so that cattle could travel without hazard across the easement within thirty days of the order. Mr. Galloway testified that the culvert had been installed but was only partially covered by July of 1992.

Though Mr. Jennings stated that he did not start doing what was required of him by the April 17, 1992, preliminary injunction until sometime after he received the order signed June 1, 1992, in the mail, he testified that he placed gravel over the concrete debris on May 4 and 5, 1992. Ms. Jennings echoed her husband's testimony that the debris was covered in May of 1992. While he testified that pictures showing what the ditch looked like before and after he covered the culvert were taken in October of 1992, Mr. Jennings insisted that he had installed and covered the culvert within thirty days of the order.

■ The trial court noted in its December 21, 1992, judgment that the court's visual examination of the property on November 11, 1992, disclosed that the concrete debris had been adequately covered and that the culvert had been properly installed and covered. Although the evidence is conflicting on exactly when the Jenningses complied with the April 17, 1992, preliminary injunction, this court is not firmly convinced that the finding of the trial court that the Jenningses had complied with the injunction within the thirty-day time period is against the weight of the evidence. Thus this court also concludes that the finding of the trial court that the Jenningses' conduct since April 17, 1992, did not evince any willful or contumacious violation of the orders of the preliminary injunction is also not against the weight of the evidence.

■ The Kerrs also argue that the trial court misstated and/or misapplied the law in failing to find the Jenningses in contempt for violating the April 17, 1992, preliminary injunction. Whether to grant a motion for civil contempt, however, is within the discretion of the trial court, whose judgment will not be disturbed on appeal absent a clear showing

that the court abused its discretion. *Campbell v. Campbell*, 825 S.W.2d 319, 322 (Mo.App.1992) *disapproved on other grounds by Ansevics v. Cashaw*, 881 S.W.2d 247, 250 (Mo.App.1994). Because this court has determined that the trial court's finding that the Jenningses' behavior after the issuance of the April 17, 1992, preliminary injunction was not contumacious and was not against the weight of the evidence, we necessarily conclude that the trial court did not abuse its discretion in failing to hold the Jenningses in contempt. Point two is denied.

### III.

■■ As their third point on appeal, the Kerrs assert that the trial court erred in failing to find the Jenningses in contempt in its December 21, 1992, judgment for allegedly violating the August 14, 1991, temporary restraining order. The temporary restraining order prohibited the Jenningses from removing the gates at either end of the easement. The Kerrs claim that the trial court misstated or misapplied the law because the court found that the Jenningses removed the gate at the Kelly Road entrance after the issuance of the temporary restraining order but failed to find that the Jenningses' conduct was a willful and contumacious violation of the order.

Mr. Jennings admitted that he removed the gate at the Kelly Road entrance in November of 1991 in order to allow a well-drilling truck to enter the easement and travel through to his property. According to Mr. Jennings, the truck was too long to negotiate the Kelly Road entrance without removing the gate. Mr. Jennings testified that at the time he removed the gate there were no cattle on the Kerrs' property. The gate was down for approximately two weeks, after which time Mr. Jennings replaced the metal gate with a cable or wire gate.

Although the Jenningses may have technically violated the August 14, 1991, temporary restraining order, the facts surrounding the violation indicate that it was not clearly willful or contumacious. The trial court did not abuse its discretion in failing to hold the Jenningses in contempt, and this court there-

fore declines to disturb the trial court's judgment. *See Watkins v. Watkins*, 839 S.W.2d 745, 747–48 (Mo.App.1992). Point three is denied.

### IV.

The Kerrs argue as their fourth and final point on appeal that the trial court erred in prohibiting the placement of gates at the entrance to or exit from the easement in its December 21, 1992, judgment and in failing to make the provisions of the preliminary injunction regarding the placement of the gates permanent. The Kerrs contend that the trial court's finding that requiring the installation of gates at any point on the easement would unduly interfere with the use of the easement by those with the right to enter and exit their properties by way of the easement was against the weight of the evidence. The Kerrs also allege that the trial court's judgment misstated and misapplied the law.

■■ When the terms of a right-of-way easement are reduced to writing, the terms of the grant prevail. *Teal v. Lee*, 506 S.W.2d 492, 497 (Mo.App.1974). The words used in the conveyance of an easement are subject to judicial interpretation only when such words are ambiguous and unclear. *Karches v. Adolph Inv. Corp.*, 429 S.W.2d 788, 792 (Mo.App.1968). Only when the exclusion of the erection of a fence or gate is not specifically set out in the grant may the servient estate owner place gates across the right-of-way, and then only if the gates do not unreasonably interfere with the right of passage. *See Claybrook v. Murphy*, 746 S.W.2d 140, 143–44 (Mo.App.1988).

■■ Paragraph No. 5 of the Sunrise Dairy Farms' Declaration of Easement provides that "Sunrise Dairy Farms and the owners of each of the tracts agree that except when necessitated by repairs or maintenance, neither shall block, obstruct, hinder or interfere with the easement area or the permitted traffic thereon." In the context of the easement, the terms "block," "obstruct," "hinder" and "interfere" have plain and common meanings which are not ambiguous and do not require judicial construction. The definitions of these terms include the com-

plete stoppage of progress on a roadway, as well as the slowing or impeding of progress over a roadway.[3] Gates slow or impede the progress of traffic on a roadway.

The clear and unambiguous language of the Declaration of Easement forbids the installation of gates on the easement as an obstruction or hinderance to traffic traveling across the easement. *Waskey v. Lewis,* 224 Va. 206, 294 S.E.2d 879, 881 (1982) ("without let or hinderance" defined to preclude the erection of manually-operated gates across

**3.** The relevant definitions are:

Block—"[T]o render (as a way) unsuitable for passage or progress by obstruction ..., to obstruct the passage, progress, or accomplishment of (someone or something) esp. by a positive obstacle...." Webster's Third New International Dictionary 235 (1981).

Obstruct—"To hinder or prevent from progress, check, stop, also to retard the progress of, make accomplishment of difficult and slow ..., [t]o block up; to interpose obstacles; to render impassable; to fill with barriers or impediments, as to obstruct a road or way." Black's Law Dictionary 1077 (6th ed. 1990).

Hinder—"Obstruct or impede." *Id.* at 729.

an easement right of way). The Kerrs' citation to *Webb v. Finley,* 806 S.W.2d 501 (Mo. App.1991), and *Claybrook,* 746 S.W.2d 140, does not further their argument, as the facts of both are distinguishable from the facts in the instant case.[4] The judgment of the trial court is not against the weight of the evidence and does not misstate or misapply the law. Point four is denied.

The judgment is affirmed.

All concur.

Interfere—"To check; hamper; hinder; infringe; encroach; trespass; disturb; intervene; intermeddle; interpose." *Id.* at 814.

**4.** The *Webb* and *Claybrook* cases are distinguishable in that neither case involved an express grant pertaining to gates. Without an express provision in the grant of easement, the courts conduct an analysis of whether the erection or maintenance of gates across the roadways are permissible, by considering "1) the purpose for which the grant was made; 2) the intention of the parties as gleaned from the circumstances surrounding the grant; 3) the nature and situation of the property; and 4) the manner in which the easement has been used." *Webb,* 806 S.W.2d at 503 (quoting *Teal,* 506 S.W.2d at 497. *See also Claybrook,* 746 S.W.2d at 143–44. Such analysis is not applicable to the case at bar.