Joseph E. WALKER Respondent,

v.

Pamela Jo and Karl HANKE Appellants.

No. WD 55559.

Missouri Court of Appeals, Western District.

June 1, 1999.

William Michael Quitmeier, Kansas City, for appellants.

Steven Wendell White, Independence, for respondent.

Before Presiding Judge JAMES M. SMART, Judge FOREST W. HANNA and Judge LAURA DENVIR STITH.

LAURA DENVIR STITH, Judge.

Defendants–Appellants Pamela Jo and Karl Hanke appeal from the trial court's judgment in favor of Plaintiff–Respondent, Joseph E. Walker, on his claims for conversion, false imprisonment, punitive damages and injunctive relief. The Hankes claim the trial court erred: 1) in finding that they converted $180,000 belonging to Mr. Walker because the money was a gift to Pamela Jo; 2) in refusing to dismiss Karl from the lawsuit because insufficient evidence supported the claims against him; 3) in refusing to admit evidence as to Mr. Walker's failure to pay certain creditors because, they alleged, he fraudulently transferred the money to Pamela Jo to avoid those creditors; 4) in granting injunctive relief to Mr. Walker because the award of money damages was an adequate remedy at law; 5) in finding in favor of Mr. Walker for false imprisonment be-

cause he was not intentionally restrained; and 6) in awarding punitive damages because there was no evidence of malice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 25, 1995, Mr. Walker called his daughter, Pamela Jo Hanke, to tell her he was getting a divorce from his current wife. At his request, Pamela Jo came to North Carolina, where Mr. Walker lived, and brought him back to her home in Kansas City, Missouri. Because of a medical condition, Mr. Walker could not walk and needed assistance. Although Mr. Walker did not get along well with Pamela Jo's husband, Karl Hanke, he moved in with the Hankes the following month, and he gave his daughter power of attorney to handle his business affairs.

Not long after Mr. Walker began living with his daughter, he received approximately $30,000 in his divorce settlement, $25,000 of which he placed into a joint account in his and his daughter's name. Mr. Walker used part of the money he received in the divorce settlement to convert the Hankes' lower level into an apartment in which he could live.

On March 18, 1996, Mr. Walker was involved in a serious automobile accident. Pamela Jo was at her father's bedside and helped nurse him back to health. After a lengthy hospital stay, Mr. Walker returned to live with the Hankes. At his request, some of the remaining funds from his divorce settlement were used to remodel the Hankes' home to make it handicap accessible. This enabled him to enter and leave through a separate wheelchair accessible entrance in the yard. At Mr. Walker's request, the Hankes also put a fence with a gate around their yard.

Pamela Jo continued to care for her father, and took an active role in proceeding with his personal injury lawsuit, including finding her father a personal injury lawyer, Pat Starke. In November 1996, Mr. Walker settled his personal injury claim for approximately $900,000. According-ing to Mr. Walker's attorney, Mr. Starke, Mr. Walker was directly paid only $243,000; the remainder of the settlement proceeds were used to pay Mr. Walker's attorney's fees and expenses as well as to pay off other bills. This included payment of Mr. Walker's medical bills from St. Joseph's hospital pursuant to an agreement which Mr. Starke had worked out with the hospital. Because Mr. Walker was concerned that IRS tax liens might exist against him, Mr. Starke also checked to see whether any such liens existed, and determined that they did not at the time of the settlement.

Mr. Walker put his share of the settlement funds into an account in Pamela Jo's name. Pamela Jo testified Mr. Walker did this so he could keep the funds out of the hands of his creditors, and she also testified, rather inconsistently, that he did so because he wanted to make a gift to her of the money. Mr. Walker testified that he never intended to make a gift of the money to her, but admitted that he did not want to have the cash in his name, even though he did not agree that he was trying to avoid paying his creditors. And, as noted, Mr. Starke testified that the health care providers and Medicare personnel knew that he represented Mr. Walker in the personal injury lawsuit and would have contacted him if there were any problems with bills or liens, but that he was aware of none, and all known creditors were paid out of the remainder of the $900,000 in settlement funds.

Mr. Walker testified that from the day he received his $243,000 portion of the settlement, the Hankes badgered him about it, saying he needed to get the money into an account bearing a high interest rate. Karl Hanke is in the insurance business. Karl and Pamela Jo told Mr. Walker that they were going to purchase annuities on his behalf, and Karl stated that he would cut his commission so Mr. Walker could earn more interest. At their insistence, Mr. Walker allowed them to buy

two $90,000 annuities from a California company with $180,000 of the settlement money. It was Mr. Walker's understanding that he could live off the interest from these annuities, and that he could get the interest every year without affecting the principal.

Mr. Walker told Pamela Jo that he wanted to give her $25,000 for keeping and caring for him in 1997. Pamela Jo replied that she would just write checks out of his checkbook periodically instead. However, when Mr. Walker noticed Pamela Jo had spent $10,000 in 18 days, he asked her to take the $15,000 balance and open her own account instead of writing more checks on his account. He then called the California company to check on his annuities and learned that both annuities were 10-year annuities, which would pay no income to the beneficiary for 10 years, and they could not be cashed without paying a 10% penalty of $18,000.

Mr. Walker also found out that, although he was listed as the beneficiary on the annuities, they were not in his name and he could not cash them. They were in the name of Pamela Jo. Mr. Walker therefore told Pamela Jo that he had no idea that she and Karl were going to invest his money in 10-year annuities, and that in light of his health condition, he felt he would not live 10 more years. Mr. Walker asked Pamela Jo and Karl to cash in the annuities so that he could take the money and move to Florida to live with his sister.

Mr. Walker further testified that his daughter and her husband refused to cash in the annuities, claiming that this was because they did not want to trigger payment of the $18,000 in penalties this would cause. Pamela Jo and Karl told him that when he needed the money for a nursing home they would get the money for him. Mr. Starke testified that he had conversations with Pamela Jo regarding Mr. Walker's desire to cash in the two annuities she purchased, and that Pamela Jo told him also that she was concerned about her father's well-being, and whether he would

have any money to take care of himself later in life. Mr. Starke said that he told Pamela Jo that it was Mr. Walker's money, and if he wanted to cash in the annuities she would have to let him, however, she refused to do so. Pamela Jo never mentioned to Mr. Starke that she thought Mr. Walker had given her the money as a gift, nor did Mr. Walker tell him the money was a gift. It was Mr. Starke's understanding that Pamela Jo had her father's power of attorney and the money was placed in her name to be used for Mr. Walker's benefit.

Shortly after the events occurred involving the annuities, Mr. Walker tried to meet with an attorney to consult about suing the Hankes for taking his settlement money and refusing to cash the annuities. They refused to let the attorney into their home to meet with Mr. Walker and told Mr. Walker that if he left to meet with the attorney, he would not be welcome back and his things would be removed from the house. For this reason, a few weeks later, in late April 1997, Mr. Walker revoked his power of attorney, changed his will, and told the Hankes he was moving to Florida to live with his sister. His sister came to get him and he did move to Florida to live with her, taking with him the remaining portion of his personal injury settlement from his bank account.

Although the Hankes had told Mr. Walker they did not want to cash in the annuities because they did not want to pay the 10% penalty, after they had their falling out with him they in fact did cash in the annuities. They did not pay the money over to him as he had requested, however. Instead, without his permission, they used most of the money to pay their own taxes, for tithing, to pay off the amount they owned on one of their vehicles, to pay off their own credit accounts, to buy clothes and food, and to take a vacation to Switzerland. By the time of their depositions, they claimed that they still had only approximately $32,000 of the $180,000 in their home. They had records

for only about $60,000 of the remainder of the money. They were thus unable to account for $85,000 to $90,000 of the remaining money from the annuities, except to say that they had spent it in the little more than 60 days since they had cashed out the annuities.

The case was tried to the court. The court found in favor of Mr. Walker on his claims for conversion against both defendants and awarded him actual damages of $180,000 and punitive damages of $25,000. The court found in favor of Mr. Walker and against both defendants on his false imprisonment claim and awarded him actual damages of $1,000 and punitive damages of $1,000. The court also granted injunctive relief to prevent the Hankes from spending any of the proceeds of the two annuities which still remained in their possession and ordered them to pay these proceeds into court. The Hankes appeal.

## II. STANDARD OF REVIEW

■ We will not disturb the trial court's decision in a court-tried case unless the judgment is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We presume the trial court's decision is correct, and the appellant has the burden of showing error. *Kerr v. Jennings*, 886 S.W.2d 117, 123 (Mo.App.1994). We view the evidence and all favorable inferences in the light most favorable to the prevailing party. *Graves v. Graves*, 967 S.W.2d 632, 635 (Mo.App.1998).

1. The trial court's findings on the conversion claim were as follows:
 "The annuities bearing Certificate Numbers DAR0001021 and LAR 0033698 in the sum total of $180,000 purchased by Defendant Pamela Jo Hanke were done so with money belonging to Plaintiff which he received as proceeds from a personal injury claim. *The Court further finds that at no time was all or any portion of the $180,000 intended to be a gift to Defendant Pamela Jo Hanke or Karl Hanke, or either of them. The court further finds and believes that Defendants, and each*

## III. CONVERSION BY PAMELA JO HANKE

■ Pamela Jo Hanke argues that the trial court incorrectly found for her father on his claim that she converted the $180,000 which she and Karl used to purchase annuities. "Conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." *Dayton Constr., Inc. v. Meinhardt*, 882 S.W.2d 206, 208 (Mo.App.1994), *citing, Lappe and Assoc., Inc. v. Palmen*, 811 S.W.2d 468, 471 (Mo.App.1991). Conversion can be proved in three ways: "1) by tortious taking; 2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to [the] owner's rights; or 3) by refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was proper." *Collins v. Trammell*, 911 S.W.2d 635, 637 (Mo.App.1995).

■ Here, the trial court found that Mr. Walker had never intended to make a gift of the $180,000 in settlement proceeds used by Pamela Jo and Karl to purchase the annuities, that they had converted these annuities and the proceeds from them by depriving Mr. Walker of the right to possession of the funds and by refusing to return them to him when requested, and that they had instead converted the funds to their own personal use and benefit by using them to pay their income taxes, to contribute to religious organizations, and to pay off promissory notes and debts.[1]

*of them, took possession of the $180,000 with the intent to exercise control over the funds and deprive the Plaintiff of the right to possession of the $180,000 and upon demand by Plaintiff refused to return any of said funds to Plaintiff and converted same for their own personal use and benefit* including, but not limited to the following:
A. The payment of personal income tax to the Internal Revenue Service; and
B. Payment of personal income tax to the Missouri Department of Revenue; and

Pamela Jo claims that she presented contrary evidence that her father had given her the money as a gift, that his later attempt to revoke the gift was of no effect since the money was already hers, that she was thus within her legal rights in purchasing the annuities and in later cashing in the annuities and spending the money, and that the trial court erred in finding to the contrary. The issue is not whether there was evidence from which the trial court could have found in her favor, however, but whether there was evidence which, if believed by the trial court, supported a judgment for Mr. Walker. We find that there was substantial evidence in the record supporting the court's ruling.

■■■ The crucial issue in determining whether Pamela Jo converted $180,000 of the proceeds of the settlement was whether Mr. Walker manifested an intent to give a gift of that portion of the proceeds to his daughter. Under Missouri law, the requirements for completion of an *inter vivos gift* are, "a present intention to make a gift on the part of the donor to the donee, and an acceptance by the donee, whose ownership takes effect immediately and absolutely." *Kennedy v. Milligan,* 915 S.W.2d 784, 789 (Mo.App.1996), *citing, In re Estate of Hoffman,* 490 S.W.2d 98, 103 (Mo. banc 1973). "Generally, a person claiming a gift has the burden of proving the gift by clear and convincing evidence." *Id.*

The evidence showed that the money Mr. Walker received as part of the settlement was his only apparent means of support and only means to pay for current and future medical bills. When asked during trial whether the $180,000 which the Hankes used to purchase annuities was to be a gift to Pamela Jo, Mr. Walker responded, "Oh, heavens no. It's all the money I had in my life." He further testified that the arrangement was that Pamela Jo could write checks on the joint account to pay for his bills, as she had his power of attorney at that time, and after his automobile accident, he was not physically able to write checks.

Further, Pat Starke, who represented Mr. Walker in his personal injury suit, testified that neither Pamela Jo nor her father ever mentioned to him that the money was a gift, that Pamela Jo had her father's power of attorney, and that Mr. Walker was concerned about some potential IRS liens and did not want the money in his name. Mr. Starke also testified that when the dispute arose as to the annuities, he told Pamela Jo that the money was her father's and she should give it back, and she made no assertion that the money was hers by gift.

The trial court was required to resolve credibility issues between the two conflicting stories offered by the parties. Here, the trial court found the testimony of Mr. Walker and his personal injury attorney, Mr. Starke, to be more credible than Pamela Jo's testimony, and we defer to the trial court's broad discretion. *Collins,* 911 S.W.2d at 637. For this reason, we reject Pamela Jo's claim that there was insufficient evidence to support the conversion claim.

## IV. CONVERSION BY KARL HANKE

■ Karl Hanke claims that, even if the evidence supported the court's finding that Pamela Jo converted the $180,000, the evidence showed that he was not involved in the conversion. Rather, he asserts, the evidence showed that the money was never placed into an account in his name, but

C. Voluntary contributions to various religious organizations; and
D. Payment of a promissory note for a 1983 automobile; and
E. Payment of credit card obligations, personal bills and accounts.
The Court finds disturbing the testimony of the Defendants, and each of them of their lack of knowledge of the whereabouts of the balance of the cash received from the above referenced annuities and that Defendants cannot account for the expenditure of thousands of dollars in cash between April 16, 1997 and June 2, 1997, the date on which the Temporary Injunction herein issued." (emphasis added).

only in the name of his wife; the money was never entrusted to him; the annuities were purchased in his wife's name, not his; and his only involvement with the money was in his capacity as insurance broker for the purchase of the two annuities at the request of Pamela Jo, after she had already obtained sole possession of the money.

As stated above, "conversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights," *Dayton Constr.*, 882 S.W.2d at 208, and may be proved by a tortious taking, any use or appropriation in opposition to the owner's rights, or *by refusal to give up possession to the owner on demand. Collins,* 911 S.W.2d at 637 (emphasis added). Here, the trial court specifically found that both Pamela Jo and Karl had taken possession of the $180,000 with the intent to exercise control over the funds and the evidence supported a finding that both Karl and Pamela Jo refused to give Mr. Walker back the money when he demanded it. Instead, both used the money for their personal expenses, including their tax liabilities, tithing, a car, and a trip to Switzerland. This evidence was sufficient to support the trial court's finding that Karl Hanke converted Mr. Walker's money.

## V. EVIDENCE OF MR. WALKER'S CREDITORS

The Hankes argue, in the alternative, that the trial court erred in awarding the $180,000 to Mr. Walker because, if the money was not given to Pamela Jo as a gift, then the only conclusion that could be drawn was that he transferred the money in order to defraud his creditors and, as a matter of public policy, under Missouri law he is not permitted to revoke the transfer. They further argue that the trial court improperly excluded evidence of an IRS tax lien.

First, we note that the trial court did permit the Hankes to introduce much evidence which they asserted showed that Mr. Walker put the money in Pamela Jo's name so that he could avoid his creditors. Specifically, he permitted them to attempt to show that Mr. Walker owed St. Joseph Medical Center $187,000; that he "feared" tax liens in the amount of $50,000; that he had other unpaid medical expenses; that his ex-wife had the legal ability to revise the divorce decree for up to one year; and that a default judgment had been rendered against Mr. Walker in the amount of $102,-654. The court was also aware that the Hankes claimed that Mr. Walker owed another tax lien to the IRS due to a business Mr. Walker had once owned. The offer of proof did not show the specific nature of this lien or that it was still on file at the time of the settlement, or that Mr. Walker was or reasonably should have been aware of it at the time of the settlement, in light of his attorney's statement that all tax liens had been paid.

In any event, even had the evidence of the tax lien been admitted, it was merely cumulative of the other evidence of debts owned by Mr. Walker and of his desire not to have the money placed in his name. Its exclusion could not have affected the trial court's resolution of this issue, which clearly turned on credibility. Whatever debts Mr. Walker may or may not have owed, if the court did not believe that he was trying to transfer money in fraud of creditors, then it properly rejected the Hankes' argument. Here, there was substantial evidence offered by Mr. Walker and his attorney, Mr. Starke, that, while he was afraid of liens and creditors, his attorney had tried to identify and pay every creditor of whom he was aware and had used a large portion of the settlement proceeds for that purpose, and that Mr. Walker was therefore not attempting to defraud creditors when he put the money in Pamela Jo's name. It is up to the trier of fact to judge the credibility and weight to be given to the evidence at trial. *Collins,* 911 S.W.2d at 637. The evidence supported his determination.

## VI. INJUNCTIVE RELIEF

The Hankes argue that the trial court erred by granting injunctive relief because there was an adequate remedy at law in that money damages are easily calculable, the money sued for here was not unique, and judgment has been awarded to Mr. Walker. Mr. Walker responds by arguing that if the Hankes had been allowed to continue spending his money pending the action for damages, Mr. Walker would have been irreparably injured and without an adequate remedy.

The primary purpose of an injunction is to preserve the status quo and prevent irreparable injury to the plaintiff pending disposition of the case on the merits. *Cissell v. Brostron*, 395 S.W.2d 322 (Mo.App.1965). An injunction is an extraordinary and harsh remedy and should not be employed where there is an adequate remedy at law. *Harris v. Union Electric Co.*, 766 S.W.2d 80 (Mo. banc 1989). In order to show entitlement to injunctive relief, the petition must affirmatively show on its face by the facts pleaded that (1) the plaintiff has no adequate and complete remedy at law, and (2) irreparable harm will be done if the status quo is not maintained. *Snelling v. St. Louis Dept. of Public Utilities–Water Div.*, 897 S.W.2d 642 (Mo.App.1995).

Irreparable harm is established if monetary remedies cannot provide adequate compensation for improper conduct. *Peabody Holding Co., Inc. v. Costain Group PLC*, 813 F.Supp. 1402 (E.D.Mo.1993). The term "adequate remedy at law" generally means that damages will not adequately compensate the plaintiff for the injury or threatened injury, or that the plaintiff would be faced with a multiplicity of suits at law. *Snelling*, 897 S.W.2d 642. For this reason, injunctive relief is usually not available if the party has an adequate remedy at law by way of damages, such as in a case requiring repayment of a debt.

Other courts have recognized that where the main suit is pending in equity, a court may grant an injunction to prevent the sale, transfer, or any change in the status of the property that will interfere with the equitable adjustment of the rights of the parties on the final decree. 43A C.J.S. *Injunctions* § 66 (1978). In other words:

> equity may protect a fund in controversy by a restraining order, pending the determination of the controversy, where there is danger that the fund will be lost or dissipated and that complainant will lose the subject matter of his action, or where the fund is in the court's possession. In those circumstances, an injunction may be granted to preserve the fund and secure it for the party to whom it may be adjudged to belong on final decree.

*Id.*

Missouri courts have repeatedly applied a similar analysis in determining whether a party may sue for conversion of a particular asset. While the usual rule is that conversion is not the proper remedy to recover an ordinary debt, "money is the appropriate subject of conversion only when it can be described or identified as a specific chattel." *Dayton Constr., Inc. v. Meinhardt*, 882 S.W.2d 206, 208 (Mo.App. 1994), citing, *Breece v. Jett*, 556 S.W.2d 696, 710 (Mo.App.1977). "Specific checks, drafts or notes will support a cause of action for conversion where they can be described or identified as a specific chattel." *Dayton Constr.*, 882 S.W.2d at 208–09.

This rationale has been specifically applied to situations like the one presented here, in which the defendant has converted funds deposited with him for one purpose and used them for anther purpose. Thus, we applied this rationale in *Williams v. Blumer*, 763 S.W.2d 242, 247 (Mo.App. 1988), where money had been deposited in a bank for a specific purpose but was used for another purpose. Similarly, *Lappe & Assoc., Inc. v. Palmen*, 811 S.W.2d 468 (Mo.App.1991), held that where money had

been placed in a stockbroker's account for a particular purpose, and the stockbroker had used the money for his personal benefit, it would not be considered a specific and identifiable *res,* and hence could be converted.

Similarly, in *Manzer v. Sanchez,* 985 S.W.2d 936 (Mo.App. E.D.1999), the plaintiff sued for, among other things, conversion of certain corporate assets. The court permitted the suit for conversion to proceed, noting that, while conversion is not usually available in the case of an ordinary debt, it could proceed where, as in that case, conversion of specific checks, drafts or notes was alleged. The court then stated, without further explanation, that it would also permit the claim for injunctive relief to proceed based on plaintiff's assertion of no adequate remedy at law. Implicitly, the court recognized that such an injunction might be required in order to preserve the *res.* Other cases have noted, without approval or disapproval, that the trial court has entered an injunction or temporary restraining order in order to prevent dissipation of assets; the propriety of that action was apparently not challenged on appeal. *See, e.g., In re Marriage of Gardner,* 973 S.W.2d 116, 119 (Mo.App.1998) (trial court granted injunction ordering husband to deposit documents representing ownership in pension funds into court so that husband could not dissipate them during pendancy of case); *Riggio v. Southwest Bank of St. Louis,* 815 S.W.2d 51, 52 (Mo.App.1991) (court issued temporary restraining order to prevent relatives from disbursing disputed funds from bank accounts pending action to determine true ownership).

Here, similarly to the above cases, the $180,000 which the Hankes converted was specifically identifiable as proceeds of the settlement, which were then used to buy two specific annuities, which the Hankes then converted the proceeds of to their own use and refused to return to Mr. Walker. These funds were therefore specifically identifiable as a *res* and so were subject to Mr. Walker's claim of conversion, and the Hankes have not argued otherwise.

■■■ By this same rationale, to the extent that any of this specific *res* or fund is still in existence, it is identifiable as a *res* and is subject to an injunction preventing further dissipation by the Hankes. That is, the trial court did not enjoin the Hankes from spending just any money; it enjoined them from spending the remainder of the specific money belonging to Mr. Walker which they converted, and ordered it paid into court in partial satisfaction of the monetary judgment rendered against them by the court. Just as the court could order the return of some piece of personal property converted, and order payment of additional damages to the extent that the converted item was harmed and its value lessened, so it could, on these unusual facts, order these funds returned to the extent they were specifically identifiable as the proceeds of the annuities so that they would be available to be used to partially satisfy the $180,000 judgment.[2] Indeed, in light of the Hankes' found tendency to spend the money and their failure to account for their past expenditures, and the court's obvious doubt as to their veracity as to where some of the money was located, this decision was not only a permissible but also a wise use of the court's equitable powers.

## VII. FALSE IMPRISONMENT

■■■ The Hankes claim that Mr. Walker failed to show he was intentionally restrained against his will, and therefore, should not have recovered on his claim for false imprisonment. False imprisonment occurs when there is confinement without

---

**2.** Of course, since an injunction is in effect the Hankes are prohibited from inhibiting this recovery by trying to hide or intermingle these funds with others, and were they to try to do so they would be in violation of the injunction and would be subject to further action by the court.

legal justification. *Bramon v. U–Haul, Inc.*, 945 S.W.2d 676, 680 (Mo.App.1997). The elements of false imprisonment are the restraint of the plaintiff against his or her will and the unlawfulness of the restraint. There is no false imprisonment, however, unless the defendant intends to cause a confinement. *Id.* at 681; W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 11, at 52 (5th Ed.1984).[3] A restraint or confinement which is not against the will of the plaintiff is not a false imprisonment. 32 Am.Jur.2d *False Imprisonment* § 13 (1995). Also, it is generally held that the plaintiff in a false imprisonment action must be aware or conscious of the confinement and there is no liability for intentionally confining another unless that person knows of the confinement. *Id.* at § 14; *Bramon*, 945 S.W.2d at 681–82.

 The parties disagree as to whether these elements were shown on the facts presented here. The evidence, considered in the light most favorable to Mr. Walker, show that the Hankes had built a fence around their yard at Mr. Walker's request. At first, the fence gate was not locked. After the parties had a falling out about the annuities, however, Mr. Walker asked an attorney, Steve White, to come to see him at the Hankes' home to talk about suing the Hankes. When the Hankes discovered this, they placed chains and a lock on the fence to keep Mr. White out.

Thereafter, Mr. Walker indicated he wanted to meet Mr. White at another location. When Mr. Walker informed the Hankes of this, they told him that they would not prevent him from leaving, but that if he did so, he would be kicked out of their house. More specifically, under cross-examination, Mr. Walker testified:

Q: Well, did you—but you said you never tried even to open the gate. You didn't know if you could open the gate.

A: Well, I asked to leave and if I could go down the street in my wheelchair to meet my attorneys. She said you leave, you get back, your furniture's going to be outside your back door back there. You will not get back in this house. I couldn't take that chance. I'm a cripple. I need insulin and stuff.

Mr. Walker thus did not meet with Mr. White outside or inside the Hankes' home. He did decide to move out within the following few days, however, and to go live with his sister in Florida. Once he made this decision, the Hankes did not attempt to stop Mr. Walker from calling his sister nor did they prevent her from picking Mr. Walker up and moving him to Florida. He thereafter filed this lawsuit.

On these facts, we believe the trial court erred in finding that Mr. Walker was intentionally held against his will. The evidence was that the Hankes did not physically keep Mr. Walker in their home; rather, they kept others out of their home. That is, while the Hankes admit that they denied other people access to Mr. Walker while he was in their home during the latter part of his stay there, and that they put a lock on the gate to keep these people out, they note that neither Mr. Walker nor any other witness ever testified that they prevented Mr. Walker from leaving, and the evidence indicates he never did actually try to leave the house, until he said he was moving to his sister's house, at which

---

**3.** *See also,* The Restatement (Second) of Torts § 35 (1965), which provides:

(1) An actor is subject to liability to another for false imprisonment if:

 a. he acts intending to confine the other or a third person within boundaries fixed by the actor, and

 b. his act directly or indirectly results in such a confinement of the other, and

 c. the other is conscious of the confinement or is harmed by it.

Comment h to subsection (2) states:

 Under this Section the actor is not liable unless his act is done for the purpose of imposing confinement upon the other, or with knowledge that such a confinement will, to a substantial certainty, result from it.

point he was allowed to leave. It also appears that the presence of the lock on the gate did not have the effect of keeping him in the house, for due to his disability he could not leave without assistance even without a lock on the gate.

We think these facts are more similar to those in *Hyatt v. Trans World Airlines, Inc.*, 943 S.W.2d 292 (Mo.App.1997), than they are to the cases finding false imprisonment. In *Hyatt*, a grandfather brought a claim for false imprisonment against police officers who told him to remain in the waiting room area of the airport and did not permit him either to approach his grandchildren or to speak with them until they were in their father's custody. The police officers did not threaten the grandfather or use physical force to keep him from the children. After the children were in their father's custody, accompanied by the police, the grandfather walked with the children and father to the baggage carousel. There he kissed the children and left the airport. *Id.* at 299.

*Hyatt* held that, in order for the grandfather to establish his false imprisonment claims, it was essential that he show the restraint imposed on him was total and not merely an obstruction of his right to go where he pleased. In *Hyatt*, there was no evidence that he was not free to leave the waiting room area or to exit the airport. The police officers merely kept him away from the children until they were in their father's care, at which point the police permitted the grandfather to have contact with the children. The restraint imposed on him was not complete and thus did not constitute false imprisonment as a matter of law. *Id.* at 299.

So too, here, the restraint imposed on Mr. Walker was not complete, for the Hankes did not prevent him from leaving their premises; they simply refused to permit Mr. White to enter and told Mr. Walker that if he left to meet with Mr. White to discuss suing them, he could not come back. While this was certainly extremely harsh and caused Mr. Walker con-

cern, they were in effect simply telling him that they did not want him to live with them if he was going to be suing them. Certainly, they hoped this would dissuade him from meeting with his attorney, but there is no evidence that they would not have let him leave if he had tried to do so. However, he never actually tried to leave until he called his sister to pick him up, and the Hankes made no attempt to prevent her from picking him up and moving him to Florida.

In these circumstances, while the Hankes conduct may not reflect the way one wishes a daughter would deal with her father, it does not constitute false imprisonment. The trial court therefore erred in rendering judgment for Mr. Walker on his false imprisonment claim. The portion of the judgment granting Mr. Walker $1,000 in actual damages and $1,000 in punitive damages on his false imprisonment claim is reversed.

Mr. Walker also asserted a claim against the Hankes for outrageous conduct. The trial judge did not determine whether Mr. Walker had proved this claim, since he found that the damages for outrageous conduct would be duplicative of the damages for false imprisonment. He therefore denied the latter claim as moot.

Mr. Walker was unable to appeal this ruling, since he was not aggrieved by the judgment, due to his recovery on the other theories alleged. Because we now reverse the judgment for false imprisonment, we remand so that, if Mr. Walker chooses to proceed on this theory on remand, the court below can rule on whether Mr. Walker proved his claim for outrageous conduct and, if so, in what amount. *But cf. Williams*, 763 S.W.2d at 248 (bodily harm must result from the severe emotional distress caused by the outrageous conduct).

## VIII. PUNITIVE DAMAGES

In their final point on appeal, the Hankes claim the trial court erred in awarding Mr. Walker punitive damages of

$25,000 on his conversion claim because there is no evidence that they ever acted with the requisite malice to sustain an award of punitive damages.[4]

██ "Punitive damages are appropriately awarded when a person intentionally converts property with an evil motive or with reckless indifference to the rights of others." *Collins v. Trammell,* 911 S.W.2d 635, 639 (Mo.App.1995). In *Dayton Constr.,* 882 S.W.2d at 209, the court found that punitive damages were proper where there was evidence that defendant intentionally converted checks belonging to plaintiff either with the evil intent to profit from the conversion or with reckless indifference to plaintiff's right to the checks. *See also Ross v. Ford Motor Credit, Co.,* 867 S.W.2d 546 (Mo.App.1993).

██ Similarly, here, in order to support an award of punitive damages, plaintiff was required to offer evidence, either direct or indirect, showing the defendants' conduct was done with an evil motive to deprive him of the $180,000 or with reckless indifference to his rights in the money. That standard was met here. The evidence, considered in the light most favorable to Mr. Walker, shows that Pamela Jo intentionally took the proceeds of her father's personal injury settlement and used it to purchase 10–year annuities in her own name, that she refused to pay over the annuity proceeds to him, but instead cashed them in for her own benefits and used them to pay her own debts, to buy a car, to go on vacation, and to even tithe with her church. She has refused to return any of this money to him, and failed to account for most of the proceeds even after he filed suit. Pamela Jo also misled her father as to her intent to purchase annuities which would provide him with income on which he could live, whereas she in fact bought annuities in her own name which would pay him nothing for 10 years. She also tried to prevent him from meeting with his attorney and threatened to put his things out on the street if he did so.

Pamela Jo did all of these things at a time when she had her father's power of attorney and he was completely dependent on her because of his accident and confinement to a wheelchair. Moreover, while she claims she thought that the money was a gift to her, she never so claimed when speaking to Mr. Hanke or to Mr. Starke, but, to the contrary, recognized Mr. Walker's rights in the money and pretended to be managing it for his benefit. These facts fully support the trial court's decision to award punitive damages against Pamela Jo for conversion.

██ While the facts concerning Karl's personal misconduct are less extensive, they were done with knowledge of the above facts. He participated in and benefited from the wild spending spree which the Hankes had with Mr. Walker's money, and, he failed to account for a large part of the proceeds when asked to do so by the court. Moreover, there was substantial evidence from which the court could have believed that Karl encouraged his wife's misconduct in taking the money in the first instance. All of this conduct, if not done with evil motive, at least was done with reckless disregard for Mr. Walker's rights in the proceeds of the annuities. The facts thus support the award of punitive damages also as to Karl.

For these reasons, the judgment in favor of Mr. Walker is affirmed on all issues except the false imprisonment claim. The judgment in favor of Mr. Walker for actual and punitive damages on the latter claim is reversed, and the cause is remanded so that the court can consider Mr. Walker's alternative claim for outrageous conduct, should he choose to pursue it on remand.

Presiding Judge JAMES M. SMART and Judge FOREST W. HANNA concur.

---

4. We have already reversed the punitive damage award for false imprisonment because of the failure to prove that a false imprisonment occurred.