Gary and Martha **BURNEY** and Gary and Patsy Snadon, Respondents,

v.

Patrick T. **McLAUGHLIN**, Trustee, and Bank of America, N.A., Appellants.

No. 24004.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 28, 2001.

Motion for Rehearing or Transfer Denied Oct. 22, 2001.

Application for Transfer Denied Dec. 18, 2001.

Robert J. Will & Larry E. Parres, Lewis, rice & Fingersh, L.C., St. Louis, for appellant.

Vincent F. O'Flauherty, Julie J. Gibson, Niewald, Waldeck & Brown, Kansas City, for respondent.

ROBERT S. BARNEY, Chief Judge.

This appeal primarily involves the relative priority of two deeds of trust held, respectively, by Respondents, Gary and Martha Burney and Gary and Patsy Snadon (hereinafter "Respondents") and Appellant, Bank of America, N.A. ("Bank") on a parcel of land located in Taney County, Missouri.[1] Although Respondents had subordinated their deed of trust to that of Bank's, they contended at trial that the subsequent material modification of the Bank's note so impaired Respondents' security that a court of equity was justified in reordering the priority of the parties' deeds of trust. The circuit court agreed with Respondents and Bank now appeals.[2]

The record shows that at the commencement of the litigation the Foxborough Inn (the "Inn") was a 178 room hotel in Branson, Missouri. The land on which it was

---

1. Bank and Bank's predecessor in interest are collectively referred to as "Bank" in this opinion.

2. Bank raises two other points on appeal. It postulates trial court error in: (a) improvidently entering a temporary restraining order ("TRO") prohibiting Bank and its trustee from foreclosing Bank's deed of trust; and (b) releasing the injunction bond posted by Respondents in conjunction with the issuance of the TRO.

located was comprised of two parcels, a "front parcel" and a "back parcel" consisting of two tracts. The front parcel is the smaller of the two parcels.

In early 1992, Respondents constructed 77 units of the Inn on the front parcel which they owned. They borrowed over one million dollars from Ozark Mountain Bank ("OMB") to pay for this construction. The loan was secured by a deed of trust on the front parcel.

Later in the year, Respondents sold the front parcel and the Inn's 77 units to C & J Properties, Inc. ("C & J") for a total purchase price of $3.3 million. The terms were, generally, as follows: C & J paid Respondents nearly $1 million in cash at closing; paid off Respondents' existing note on the property by borrowing $1.1 million from OMB and giving OMB a first deed of trust on the front parcel; and gave Respondents a note ("Respondents' Note") for the remaining $1.2 million of the purchase price secured by the lien of a second deed of trust on the front parcel ("Respondents' Deed of Trust").

Less than a year later, C & J borrowed approximately $3.2 million from Bank in order to refinance the existing OMB debt and fund C & J's efforts to construct an additional 101 units, located on the back parcel, which C & J purchased. This was accomplished in three steps:

First, on June 23, 1993, Bank loaned C & J $1.077 million to pay the balance of the note secured by the first deed of trust held by OMB. This new note ("Bank's Note No. 1") was secured by a deed of trust against the *front* parcel only ("Bank's Deed of Trust No. 1"). It had a maturity date of December 23, 1993, and bore interest of 7% before maturity and 13% in the event of default. No principal payments before maturity were required. The

monthly payments were to be interest only and the maker agreed to pay "all costs of collection when incurred, including reasonable attorneys' fees."

Second, on the same date Respondents executed a Subordination Agreement in favor of Bank. It provided, in pertinent part, that Respondents subordinated their Note and Deed of Trust (on the front parcel) to Bank's Deed of Trust No. 1, "to the end that the [Bank's Deed of Trust No. 1] shall be superior to [Respondents' Deed of Trust]." The subordination agreement contained no other significant provisions.

Third, Bank loaned C & J $2.117 million ("Bank's Note No. 2") to fund the construction of 101 additional units on the back parcel. This note was secured by a deed of trust placed against the *back* parcel only ("Bank's Deed of Trust No. 2").

On June 2, 1994, C & J granted Bank another deed of trust ("Bank's Deed of Trust No. 3") securing both Bank's Note No. 1 and Bank's Note No. 2. This latter deed of trust placed a lien against both the front parcel and the back parcels.

Almost immediately after expansion of the Inn, C & J experienced financial problems which persisted over a number of years. As best we can glean from the record, an economic downturn occurred in the Branson area due to a glut of motel rooms. As a result, between December 1993 and December 1999, Bank and C & J (and a third party in some instances) entered into a series of eight separate modification agreements, which resulted in extending the maturity date and other terms and conditions of Bank's Note No. 1 and Bank's Deed of Trust No. 1, and the last three modifications extended maturity date and other terms of Bank's Notes No. 1 and No. 2.[3] Each modification was duly record-

---

**3.** The eight modification agreements general- ly provided for the extension of maturity dates

ed. Respondents contend that they were never notified of any of these modifications nor was their consent obtained for any of these modifications.

During December of 1999, C & J terminated its payments to Bank on Bank's Note No. 1 and Bank's Note No. 2 and notified Bank that the Inn would not re-open following the annual winter closing period in 1999–2000. Bank subsequently instructed the trustee(s) of its three deeds of trust to commence foreclosure proceedings. Two days prior to the foreclosure sale Respondents filed a three-count petition for equitable relief. Respondents sought, in pertinent part: (a) temporary injunctive relief prohibiting Bank from conducting the foreclosure sale; (b) a declaration that their deed of trust, i.e., Respondents' Deed of Trust (secured by the front parcel), was prior and superior to Bank's Deed of Trust No. 1, as well as to any other deeds of trust Bank held against the front parcel; and (c) requested judicial foreclosure of Respondents' Deed of Trust, pursuant to § 443.190, RSMo 1994, *et seq.*

Respondents argued that their interest in the front parcel should be declared "superior to and take[ ] priority over any interest asserted by Bank" because the "actions and conduct of Bank . . . so materially adversely affected and impaired [Respondents'] collateral and/or destroyed the original economics of the subject property, so as to render the Subordination Agreement of June 23, 1993[,] null and void."

The circuit court seasonably entered an order granting a temporary restraining order enjoining Bank from conducting its foreclosure sales on June 9, 2000, provided Respondents posted an injunction bond of $100,000.00, which Respondents did.

> Review of this non-jury matter is set forth in Rule 84.13(d). In such a review, this Court views the evidence and permissible inferences drawn therefrom in the light most favorable to the judgment and affirms the judgment unless it is against the weight of the evidence, there is insufficient evidence to support it, or it erroneously declares or applies the law.

*Ridgway v. TTnT Dev. Corp.*, 26 S.W.3d 428, 430 (Mo.App.2000). In applying this standard of review, we give due regard to the trial court's opportunity to judge the credibility of witnesses. If there is conflicting evidence, this Court will defer to the trial court's determination. However, we do not defer to the trial court's determination of law. *See Empire Dist. Elec. Co. v. Gaar*, 26 S.W.3d 370, 373 (Mo.App. 2000). Furthermore, "when the facts are not controverted or the case involves admitted facts, or where the evidence is not in conflict, there is no deference due the trial court's judgment." *Jones v. Jones*, 891 S.W.2d 551, 553 (Mo.App.1995).

In its Point One, Bank asseverates circuit court error in declaring Bank's Deed of Trust No. 1 (on the front parcel) junior

of Bank's Note 1, secured by Bank's Deed of Trust No. 1, for periods ranging from six months to fourteen months. The second modification agreement changed the interest from 7% to 8.25%; the third modification agreement raised the interest rate to 10%, Bank's "Corporate Base Rate" ("CBR") plus 1%; the fourth modification provision changed the interest rate to CBR plus 1.5%; the fifth modification agreement provided for cross-collateralization and cross-default clauses, which clauses had been previously incorporated into the loan structure, *supra*, through Bank's Deed of Trust No. 3 in June of 1994. The sixth and eighth modification agreements maintained the existing interest rates on Bank's Note No. 1 and the seventh modification agreement lowered the interest rate on this same note to CBR plus 1%. Other changes involved additional closing fees, appraisal fees and provisions relating to bankruptcy procedures.

to that of Respondents' Deed of Trust. Bank maintains that Respondents do not dispute that in executing their subordination agreement they took a junior position to that of Bank. Bank maintains that the circuit court was not justified in altering the priority of the two deeds of trust because Respondents failed to show that Bank's modification agreements relating to Bank's Note No. 1 and Bank's Deed of Trust No. 1 "effectively destroyed the collateral" that Respondents held. On the contrary, Bank contends that as a result of these modification agreements C & J was able to avoid default for several years during which time Respondents were able to collect on a portion of their loan to C & J.

Furthermore, Bank argues that even if this Court were to conclude that the modification agreements "substantially impaired" the junior lienholders' interests and were invalid for lack of Respondents' consent, this Court should, nonetheless, reverse the decision of the circuit court which entirely disregarded the subordination agreement and afforded complete priority to Respondents. Citing RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* § 7.3 (1997), Bank insists that under these conditions it would lose priority *only to the extent of the modifications.*

Respondents counter that the "remedy awarded when there is prejudice to the junior lienor—partial or complete loss of priority—depends on the degree of prejudice." They assert that Bank's Note No. 1 went from one page of text to seven in the final modification; that no one ever notified them of these modifications; that there were eight extensions of the maturity date of the note and multiple increases in the interest rate charged by over 50% (from 7% to 10¾%), which resulted in over $200,000.00 in additional interest payments to the Bank.

Furthermore, Respondents maintain that the introduction of cross-collateralization provisions added two tracts of property to the collateral contemplated by the original note and tripled the amount of debt collateralized from $1.2 million to over $3.4 million. They also point to the introduction of cross-default provisions, waiver of bankruptcy stay provisions, and the addition of appraisal fees, loan extension and renewal fees, and payment of collection fees which together " 'substantially impaired' the value of [their] security interest—the motel property—and 'effectively destroyed' the remaining equity in the property."

## I.

The matter of the reordering of priorities of deeds of trusts appears to be a matter of first impression in Missouri. Neither of the primary parties has called our attention to any reported case in this state, and our own research has failed to find any reported cases in this jurisdiction involving this particular subject. However, as discussed, *infra,* a significant body of case law from other jurisdictions has dealt with this issue.

We initially observe that a "mortgagee may waive the priority of his lien...." *Community Title Co. v. Crow,* 728 S.W.2d 652, 654 (Mo.App.1987). Also, "[i]t is entirely competent for the parties in interest, upon a sufficient consideration, to make an agreement by which a junior lien on real estate may be given precedence over a superior encumbrance." *Sinclair Refining Co. v. Wyatt,* 347 Mo. 862, 149 S.W.2d 353, 356 (1941). "Because it alters the normal priority of the mortgages, priority under a subordination agreement is strictly limited by the express terms of the agreement." *Citizens and South. Nat. Bank v. Smith,* 277 S.C. 162, 284 S.E.2d 770, 771 (1981).

We also note that "[r]eplacement and modification of senior mortgages commonly occur." NELSON & WHITMAN REAL ESTATE FINANCE LAW, 3d ed., Vol. 1, § 9.4 (1993); see Comment a, RESTATEMENT (THIRD) PROPERTY, *Mortgages,* § 7.3 (1997). "Moreover, a senior mortgagee and the mortgagor frequently agree to certain modifications in the terms of the mortgage debt." NELSON & WHITMAN REAL ESTATE FINANCE LAW, 3d ed., Vol. 1, § 9.4 (1993). "These modifications often entail an extension of the term, a change in the interest rate, and in some instances, an increase in the principal amount of the mortgage debt. Frequently, such modifications represent an attempt to deal with mortgagor financial distress." *Id.* However, these modifications "can create priority disputes vis à vis intervening junior lienholders." *Id.*

"It is well established that while a senior mortgagee can enter into an agreement with the mortgagor modifying the terms of the underlying note or mortgage without first having to notify any junior lienors or to obtain their consent, if the modification is such that it prejudices the rights of the junior lienors or impairs the security, their consent is required." *Shultis v. Woodstock Land Dev. Assocs.,* 188 A.D.2d 234, 594 N.Y.S.2d 890, 892 (N.Y.App.Div.1993); *see Fleet Bank v. County of Monroe Ind. Dev. Agency,* 224 A.D.2d 964, 637 N.Y.S.2d 870, 871 (N.Y.App.Div.1996); *Empire Trust Co. v. Park–Lexington Corp.,* 243 App. Div. 315, 321, 276 N.Y.S. 586, 592 (1934); *Shane v. Winter Hill Fed. Sav. and Loan Ass'n.,* 397 Mass. 479, 492 N.E.2d 92, 95 (1986). "Failure to obtain the consent in these cases results in the modification being ineffective as to the junior lienors and the senior lienor relinquishing to the junior lienors its priority with respect to the modified terms." *Shultis,* 594 N.Y.S.2d at 892 (citations omitted). "While this sanction ordinarily creates only the partial loss of priority noted above, in situations where the senior lienor's actions in modifying the note or mortgage have substantially impaired the junior lienors' security interest or effectively destroyed their equity, courts have indicated an inclination to wholly divest the senior lien of its priority and to elevate the junior liens to a position of superiority." *Id.* (citation omitted); *see* cases cited in FRIEDMAN, CONTRACTS & CONVEYANCES, 6th ed., Vol. 2, § 6.5 n. 13 (1998).

In *Koloff v. Reston Corp.,* 1993 WL 106062, *supra,* a case cited by Respondents, Koloff agreed to subordinate his interest in a mortgage allowing Wilmington Trust Company ("WTC") to take a senior position in its loan with a Mr. Reston, and which secured advances under a construction loan in the approximate amount of $2.2 million. *Koloff,* at 1. The construction loan was to be paid five months later. Seven months later the WTC mortgage was modified and restructured by WTC via two agreements with Reston. The first agreement postponed the due dates under the WTC mortgage by one year and established a special reserve fund for loan payments. The second agreement consolidated the WTC loan with seven other mortgages by Reston which pertained to other properties, a process known as "cross collateralization." *Id.* at 1. After this modification the original WTC mortgage, to which Koloff had subordinated, had been restructured so that it secured loans in excess of $20 million, rather than the original $2.2 million and extended the reach of the lien to six parcels of land rather than the original parcel. *Id.* at 1. The chancery court granted a summary judgment declaring that Koloff's mortgage constituted a first lien against the encumbered property which was then superior to WTC's mortgage lien. *Id.* at 4. In reordering the priority of the mortgages the *Koloff* court observed "the

mortgage terms of WTC's modified lien, as a matter of law materially differ[ed] from the mortgage terms referred to in the subordination clause of [Koloff's mortgage]." *Id.* at 12.

A similar result was reached in *Gluskin v. Atlantic Savings and Loan Ass'n.*, 32 Cal.App.3d 307, 108 Cal.Rptr. 318 (1973), another case cited by Respondents in support of their position. In *Gluskin*, plaintiff sold 63 acres of land. In addition to cash monies, plaintiff received a non-interest bearing promissory note from purchaser secured by a deed of trust for $175,000.00. The deed of trust contained a subordination provision in which plaintiff subordinated the priority of its deed of trust to two deeds of trust held by Atlantic Savings and Loan ("Atlantic") on the purchased property which secured two construction loans of approximately $1.14 million and $2.4 million. The subordination agreement also provided for plaintiff sharing 50% of the profits generated by the sale of homes on the property it had sold to purchaser. *Id.* at 320. As best we can glean from the opinion, as a result of a "very poor market" for the sale of single family residential homes, Atlantic and purchaser modified the $1.14 million note by reducing the face amount to $712,530 and raising the interest rate from 6¼% to 10%, shortened monthly payments and shortened the maturity of the note from 30 years to 10 months, with a balloon payment at the end. *Id.* at 321. Purchaser ultimately defaulted in payment of its two notes to Atlantic and Atlantic purchased the property at a foreclosure sale, thereby extinguishing any interest plaintiff had in the property. Plaintiff brought an action for a "declaratory decree" that the lien of plaintiff's deed of trust held by it was prior and superior to the liens of Atlantic. Citing public policy considerations which required protection of subordinating sellers, the appellate court reversed the trial court's judgment in favor of Atlantic and remanded the matter for a new trial. *Id.* at 322, 325. In doing so, it also observed that a "borrower may not bilaterally make a material modification in the loan to which the seller has subordinated, without the knowledge and consent of the seller to that modification, if the modification materially affects the seller's rights." *Id.* at 323.

▨ It is our view, however, and the view of both parties to this appeal, that cases in which a junior mortgage lien is elevated above the paramount mortgage are the exception and not the rule. It is this Court's observation, on reviewing the case law in this area, that only in a rare number of cases such as in *Koloff* and *Gluskin, supra,* where the paramount mortgage has substantially impaired the security interest of the junior mortgage, are the priorities rearranged. *See Lennar Northeast Partners v. Buice,* 49 Cal. App.4th 1576, 57 Cal.Rptr.2d 435, 442–443 (1996) discussing and distinguishing *Gluskin, supra; see also* FRIEDMAN, CONTRACTS & CONVEYANCES, 6th ed., Vol. 2, § 6.5 (1998). We are confirmed in this view by our reading of RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* § 7.3 (1997). It provides in pertinent part:

> Replacement and Modification of Senior Mortgages: Effect on Intervening Interests.
>
> (b) If a senior mortgage or the obligation it secures is modified by the parties, the mortgage as modified retains priority as against junior interests in the real estate, *except to the extent that the modification is materially prejudicial to the holders of such interests* and is not within the scope of a reservation of right to modify as provided in Subsec-

tion (c).[4]

RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* § 7.3(b) (1997) (emphasis added). The term "materially prejudicial" cannot be precisely defined. It is similar to the term "substantially impaired." *See Shultis,* 594 N.Y.S.2d at 892. Necessarily a determination when material prejudice occurs is fact-driven by the circumstances of each case. In this connection, Comment b, to § 7.3 RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* (1997) *supra,* sets out:

> There is a strong presumption under this section that a time extension on a senior mortgage or obligation, standing alone, is not materially prejudicial to intervening interests. A finding of material prejudice is justified only in the rare situation where the time extension can fairly be said to place the junior interest in substantially weaker position. The typical junior lienholder is normally grateful to have a time extension forestall the destruction of its lien by a senior foreclosure.

In accord with the foregoing comments are *Lennar Partners,* 57 Cal.Rptr.2d at 440 ("An extension of a senior debt that merely alters the date of payments generally does not adversely affect the junior lienholders."); *Eurovest Limited v. 13290 Biscayne Island Terrace Corp.,* 559 So.2d 1198, 1199 (Fla.App. 3 Dist.1990); *Resolution Trust Corp. v. BVS Dev., Inc.,* 42 F.3d 1206, 1215 (9th Cir.1994)(interpreting California law); *see also* NELSON & WHITMAN REAL ESTATE FINANCE LAW, 3d ed., Vol. 1, § 9.4 (1993).

"Other sorts of changes that may be made in the terms of a replacement mortgage are not so benign. Obviously an increase in the principal amount will prejudice the holders of junior interests." Comment b, RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* § 7.3 (1997). "[W]hen the obligation is increased, by an increase in the principal amount or an increase in the interest rate, the junior lienholder's position is worsened. (3 POWELL, *Real Property,* (1996) § 458, pp. 37–258—37–259)." *Lennar,* 57 Cal.Rptr.2d at 440; *see Shultis,* 594 N.Y.S.2d at 893.

■ Accordingly, "[w]here the modification entails an increase in the senior mortgage interest rate or an increase in its principal amount, the junior lienor will gain priority over the earlier mortgage to the extent of the modification." NELSON & WHITMAN REAL ESTATE FINANCE, 3d ed., Vol. 1, § 9.4 (1993); *Shultis,* 594 N.Y.S.2d at 893; *see* Comment c, RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* § 7.3 (1997).

Lastly, cross-collateralization provisions which tie together unrelated properties, the foreclosure of which triggers foreclosure of all properties held by the debtor, can pose "unique risks" to the interests of a junior lienholder depending upon the circumstances of each case. *See Koloff, supra,* at 3. We now apply the foregoing principles to the facts of this case.

■ We are not convinced that the eight extensions of the maturity date of Bank's Note No. 1 over a six year period, in and of themselves, materially prejudiced Respondents interest in its collateral to

4. RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages,* § 7.3(c) (1997) sets out, in pertinent part, that:
> If the mortgagor and mortgagee reserve the right in a mortgage to modify the mortgage or the obligation it secures, the mortgage as modified retains priority even if the modi-

cation is materially prejudicial to the holders of junior interests in the real estate, except as provided in subsection (d).
In this opinion we neither affirm or reject the tenets of § 7.3(c), since they are outside the scope of the facts in the instant case.

the extent that the circuit court was justified in holding the parties' subordination agreement null and void. *See Lennar Partners*, 57 Cal.Rptr.2d at 440; *Eurovest*, 559 So.2d at 1199; *Shultis*, 594 N.Y.S.2d at 893. "The holder of the junior encumbrance is regarded as necessarily taking the risk of a postponement (frequently an advantage to a second mortgagee) of the date of payment of the whole or part of the senior mortgage debt." *Guleserian v. Fields*, 351 Mass. 238, 218 N.E.2d 397, 401–02 (1966). "The rule has been referred to as the 'universal rule.'" *Id.* at 402.

Here, while Bank reaped additional interest payments, as best we can glean, the record also shows that during this time period the principal owed Respondents on Respondent's Note was reduced from an approximate balance of $1.077 million to approximately $932,000.00 at the time of C & J's default in December 1999.[5] This constituted a reduction of about $145,000.00 in the principal amount owed Respondents. More importantly, extending the maturity date of Bank's Note No. 1 resulted in Respondent receiving over $762,000.00 in payments from C & J after December 1993, the original maturity date for Bank's Note No. 1.[6]

■ It is our view, however, that modifications of Bank's Note No. 1 requiring C & J to pay interest in excess of 7%, combined with the addition of appraisal fees, loan extension and renewal fees, cross-collateralization, cross-default and waiver of bankruptcy stay provisions, all of which were absent from the original text of Bank's Note No. 1 on June 23, 1993, materially impaired the value of Respondents'

interest in the front parcel of the property. This is supported by the record. *See Lennar Partners*, 57 Cal.Rptr.2d at 439–43; *Shultis*, 594 N.Y.S.2d at 892–93; *Fleet Bank*, 637 N.Y.S.2d at 871–72. As previously set out, Respondents suggest that these interest rate changes resulted in the Bank receiving an additional $200,000.00 in interest payments. Bank acknowledges that the sum of $165,842.17 constitutes the difference between the total payoff amount actually due Bank and the "adjusted" payoff amount had the Bank continued to charge interest at the rate of 7% per annum on Bank's Note No. 1.

Furthermore, the modification agreement of March 30, 1999, made provisions for the payment by C & J of a "loan extension fee" in the amount of $14,265.98 together with an "appraisal fee" of $4,000.00, which added to the debt burden assumed by C & J. The cross-collateralization clauses meant that the front parcel, as well as the back parcel, were pledged as collateral for two of Bank's loans, and in a similar vein, cross-default provisions contained in the modification agreements meant that a default by C & J under either of Bank's loans acted as a default under both. Without these cross-collateralization and cross-default provisions, C & J would have been better posed to pay on one Bank note and not the other. While speculative, C & J might have been better positioned to have avoided the risk of a foreclosure on the entire property. *See Koloff*, 1993 WL at 4.

■ Despite these impairments, however, we are not prepared to agree that the Bank should lose its priority as senior lienholder relative to its senior position

---

5. Our recitals relative to account balances are approximate only and are subject to a more formal accounting.

6. Respondents' Note of October 1992 provided for monthly installment payments of $11,580.27, carrying interest at the rate of 10% annually, maturing with a final balloon payment in five years.

relating to the front parcel. The equities in this case do not require such a result. Here, the impairment to Respondents' security and its rights as a junior lienholder engendered by the modification agreements can be eliminated largely by denying priority to the modifications, save for the extension of the maturity dates of Bank's Note No. 1. *See Lennar*, 57 Cal. Rptr.2d at 442; see RESTATEMENT (THIRD) OF THE LAW OF PROPERTY, *Mortgages*, § 7.3(b) (1997). Denying priority only to the modification agreements in terms as aforesaid goes a long way to restore Respondents to the same position as before: the position they bargained for by agreeing to accept a second lien on the property as security for their loan. *Id.*

The circuit court erred as a matter of fact and law in its declaration that the lien of Respondents' Deed of Trust No. 1 was superior to that of Bank's Deed of Trust No. 1. *Ridgway*, 26 S.W.3d at 430. Bank's Deed of Trust No. 1 dated June 23, 1993, per its original terms, securing Bank's Note No. 1 of the same date, per its original terms-save for extension of maturity dates, should hold a senior position to that of Respondents' Deed of Trust and Respondents' Note. Additionally, Respondents' Deed of Trust securing Respondents' Note should continue to hold a senior position to that of Bank's Deed of Trust No. 3, which secures Bank's Note No. 1 and Bank's Note No. 2. *See Howard, Singer & Meehan v. Clayton Fed. Savings and Loan Ass'n.*, 578 S.W.2d 56, 57 (Mo.App.1978).[7] Point One is well taken, in part.

## II.

As previously set out, in its remaining two points Bank premises circuit court error arising from both the issuance of a TRO preventing Bank's foreclosure of the Inn, and in releasing the injunction bond posted by Respondents in conjunction with the issuance of the TRO. Both points are interrelated and are reviewed together.

 A TRO is an injunction and generally an appeal lies from an order dissolving it. *Hagen v. Bank of Piedmont*, 763 S.W.2d 384, 385 (Mo.App.1989); *see also Furniture Mfg. Corp. v. Joseph*, 900 S.W.2d 642, 646 (Mo.App.1995). "The primary purpose of an injunction is to preserve the status quo and prevent irreparable injury to the plaintiff pending disposition of the case on the merits." *Walker v. Hanke*, 992 S.W.2d 925, 933 (Mo.App. 1999). Injunctive relief is discretionary and is granted to prevent likely irreparable harm. It is generally unavailable where the prosecuting party has an adequate remedy at law. *Hagen*, 763 S.W.2d at 385. " '[A]dequate remedy at law' generally means that damages will not adequately compensate the plaintiff for the injury or threatened injury, or that the plaintiff would be faced with a multiplicity of suits at law." *Walker*, 992 S.W.2d at 933.

 "Damages are allowable 'where the injunction was improvidently granted, was wrongful in its inception or at least was continued owing to some wrong on the part of the plaintiff.' " *Rogers v. Stanec*, 971 S.W.2d 340, 342 (Mo.App.1998) (quoting *Kelder v. Dale*, 313 S.W.2d 59, 62 (Mo.App.1958)). However, where the hearing court determines that the temporary injunction was properly and providently issued, and there is support in the record for the hearing court's determination, the right of an action on the injunction bond does not accrue. *See Pierce v. Campbell*, 217 Mo.App. 179, 274 S.W. 875, 876 (1925).

---

**7.** Bank's Deed of Trust No. 2, securing Bank's Note No. 2, involve only the back parcel.

■ Bank contends that that a mortgagor is not entitled to injunctive relief to prevent foreclosure of its deed of trust because, generally, either an adequate remedy at law exists or proof of irreparable harm is virtually nil in these types of cases. *See*, e.g., *Hagen, supra*. However, none of the cases cited by Bank involved a factual scenario similar to the instant case, arising from an equitable action which sought to reorder the priorities of notes and deeds of trust. Respondents showed that no adequate remedy at law was available to them, given that the value of their security interest had been so impaired that they were entitled to equitable relief to prevent their security interest from becoming worthless in the event of the foreclosure contemplated by Bank.[8] Given the facts of this case we cannot say that the TRO was improvidently entered.

■ In the instant matter, the TRO "was merely an auxiliary remedy to the main purpose of the suit ...," *Jones v. Campbell*, 189 S.W.2d 124, 126 (Mo.App. 1945), which sought to reorder the priorities of the parties' notes and attendant deeds of trust. Accordingly, given the facts of this case " '[w]here complainant shows himself to be entitled to some purely equitable remedy, thus giving equity jurisdiction of the case, an injunction will be granted to restrain pending or threatened actions at law concerning the same subject matter.' " *Id.* (quoting 43 C.J.S.,

*Injunctions,* § 37, 471); *see also Walker*, 992 S.W.2d at 933 ("where the main suit is pending in equity, a court may grant an injunction to prevent the sale, transfer, or any change in the status of the property that will interfere with the equitable adjustment of the rights of the parties on the final decree."); 43A C.J.S., *Injunctions*, § 66 (1978).

Accordingly, the trial court did not abuse its discretion in entering the TRO. Nor did it abuse its discretion in dissolving the TRO. As discussed previously, Respondents were justified in seeking and obtaining injunctive relief as an adjunct to their main action. *Jones*, 189 S.W.2d at 126. Once the circuit court order granted Respondents equitable relief there was no further need to continue the restraining order in force.

■ In either event, given the state of the record, Bank was not entitled to obtain damages resulting from the issuance of the TRO in the first instance because it made no request for damages. "Numerous cases hold that a proceeding for the assessment of damages on an injunction bond is in the nature of a new, separate and independent controversy." *Rogers*, 971 S.W.2d at 343. "Thus, the usual, accepted, and better practice is to file an independent action on the bond after the injunction proceedings are completed."[9] *Id.* "A motion to assess dam-

---

8. Evidence exists in the record suggesting that the Bank intended to sell the entire motel as one parcel, which would have required the outlay of a sum of money greater than the collateral to which Respondents had initially subrogated their interest in 1993. Without equitable relief, Respondents contention that they would have had to pay the Bank's first lien and bid in their debt on the entire 177 unit motel, which was originally appraised at $5 million, posed a distinct probable scenario. This would have required Respondents to invest a large sum of money merely to protect

their interest. Necessarily, this would have entailed more litigation in the future.

9. "The measure of damages recoverable on an injunction bond is the amount necessary to compensate a defendant for losses directly caused by the restraint...." *Kahn v. Royal Banks of Missouri*, 790 S.W.2d 503, 511 (Mo. App.1990). "Damages 'occasioned by the underlying suit independent of the injunction' are not recoverable from the proceeds of an injunction bond." *Id.* (quoting *C.H. Albers Comm'n Co. v. Spencer*, 236 Mo. 608, 139

ages on an injunction bond is well grounded in our jurisprudence and is definitely established as part of our procedure. It is in its nature and effect a pleading which initiates a proceeding to assess damages in such cases.'" *J and P Trust v. Continental Plants Corp.*, 541 S.W.2d 22, 26 (Mo. App.1976) (quoting *State ex rel. Latshaw v. Reeves*, 237 Mo.App. 812, 177 S.W.2d 537, 539–40 (1944)). Here, the record is devoid of a showing that Bank filed a motion to assess damages on the injunction bond. Points Two and Three are denied.

The judgment of the circuit court dated October 31, 2000, as modified December 8, 2000, is set aside and the cause is remanded with directions to the circuit court to enter a judgment consistent with this opinion. Upon remand, the trial court is directed to determine the balance due under the original terms of Bank's Note No. 1, except for the maturity date extensions. The judgment should reflect that Respondent's deed of trust is junior to that balance as determined. To this end, the circuit court is authorized to conduct further proceedings and make such further orders which may be just and proper, including orders relating to foreclosure of the parcels of land involved in this litigation.

MONTGOMERY, J., concurs.

RAHMEYER, J., concurs.

S.W. 321, 326 (1911)). "The party seeking damages has the burden of proving loss which is the direct result of the issuance of the restraining order." *Id.*